## AMERICAN CEREAL CO. v. ELI PETTIJOHN CEREAL CO.

### (Circuit Court, N. D. Illinois. March 25, 1896.)

1. TRADE-MARK—USE OF SURNAME.

A manufacturer cannot, by extensively advertising his name in connection with goods made by him, acquire the right to enjoin another person with the same surname from selling similar goods under that surname, when such other person has for many years been engaged in the manufacture of such goods, and puts his full name on his labels.

2. SAME—TRADE-MARK NOT BASED ON FACT.

The owner of several mills situated in different states, who has ceased to manufacture at one of his mills, and supplies the customers of that mill with the product of his other mills, cannot enjoin the violation of a trademark which assumes that said mill is still running.

In Equity. Suit for injunction by the American Cereal Company against the Eli Pettijohn Cereal Company. Complainant moves that defendant be punished for violating a preliminary injunction, and defendant moves to dissolve such injunction.

Swift, Campbell, Jones & Martin, for complainant.
Willard & Evans and Frederick Reed, for defendant.

SHOWALTER, Circuit Judge. In October, 1889, William A. Pettijohn left San Francisco, Cal., where he had been engaged in man-

ufacturing rolled wheat, and came to Minneapolis, in the state of Minnesota. He leased a mill in the latter city, and, having equipped it with machinery brought by him from California, he, with his two brothers, Samuel and Lawrence, commenced what proved to be a successful business in the manufacture of rolled wheat. This product, called by them "Pettijohn's California Breakfast Food," was put on the market in small paper or pasteboard boxes or parcels, as is the custom of the trade with similar products. The wrapper contained, as a trade-mark, the pictorial representation of a bear, and also the words: "Pettijohn's California Breakfast Food, Prepared by W. A. Pettijohn, Sole Manufacturer, San Francisco, California, and Minneapolis, Minnesota. Machinery invented for this purpose, and shipped from California." Some seven months later one Beeman was admitted as a partner, and the firm name became Beeman & Pettijohn. In October, 1890, the three brothers caused a corporation to be formed, called the "Pettijohn California Breakfast Food Company." This concern succeeded to the business of Beeman & Pettijohn, and carried on the same down to October, 1893, when it leased its mill to complainant, at the same time selling to complainant (which took possession November 1, 1893) its machinery; and all its tangible property, together with its business and good will, including its trade-marks. The bill states that, up to the time of this assignment to complainant, some $65,000 had been expended in advertising the "Pettijohn California Breakfast Food," the trade in such article having been widely extended through the territory east of the Rocky Mountains. Upon the wrapper used at the time of the transfer to complainant, the bear appears; but not the words, "Machinery invented for this purpose, and shipped from California," though said words were used on the wrapper or boxes for a time after the Pettijohn California Breakfast Food Company had succeeded to the business. The said machinery, however, still remained in use in the mill. The complainant continued the business for about 2½ months, or until January 17, 1894, when said mill was destroyed by fire. At the time of said fire, complainant was the owner of several other mills, in different parts of the country, at which rolled wheat was made,—two in Ohio, one at Chicago, and another at Cedar Falls, in Iowa. These mills had apparently been purchased by complainant from prior owners. The rolled wheat made at each was put upon the market, with distinctive labels and markings upon the boxes, identifying the mill at which it had been made, or the place of manufacture. Upon the destruction of its Pettijohn mill at Minneapolis, complainant ceased doing business in that city, but supplied the market for the "Pettijohn California Breakfast Food" with the product made at these different mills, using for that trade the labels which had been in use at the Minnesota mill up to the time of the fire, but without the designation of the place of manufacture, or any other designation of the mill at which the product was made. In this manner complainant's business as a manufacturer of the "Pettijohn California Breakfast Food" was conducted at the time of the filing of this bill, in April, 1895.

Eli Pettijohn, father of the three brothers already mentioned, was

by trade a millwright. He went to Minnesota in 1840, and resided there until 1876, when he left Minneapolis and went to California. In 1877 he commenced making rolled wheat at the city of San Francisco, and selling it under the name of "Pettijohn's Rolled Wheat." In 1879 his son William A. became interested with him. But the enterprise was experimental, the partners were not strong financially, and from 1880 to 1884 there appears to have been a cessation in the business. In May, 1884, they recommenced; at the same time improving the product, as it would seem, by experimental modifications in the process of manufacture. Thenceforward Pettijohn's rolled wheat, under the names, "Pettijohn's Breakfast Food," "Pettijohn's Breakfast Gems," or "Pettijohn's Breakfast Pearls," has been constantly made in California, and in 1890 this product had gained wide currency in the markets west of the Rocky Mountains. It was also known to some extent in the eastern portion of the country. William A. Pettijohn was constantly employed in this business. Eli was also intermittently employed either in the sale or manufacture of the article. He claims also to have been interested as a partner with his son William in such rolled wheat business as was carried on by the son in California, but this is denied by the son. After William left California, Eli was employed in the mill of one Laumeister, where Pettijohn's rolled wheat was manufactured and sold under the name, "Pettijohn's Breakfast Gems." In 1892 William returned to California, and he and his father resumed business together in San Francisco as manufacturers of the product in question. This business was continued until December, 1892, when Eli formed a partnership with Hartwell and another, under the name, "Pettijohn's Manufacturing & Milling Company." This firm made the Pettijohn rolled wheat at a mill in Oakland, Cal. This business was carried on until March, 1894. They called their product "Pettijohn's Breakfast Pearls." Pending this last enterprise, and in November, 1893, Eli Pettijohn went from California to Minneapolis. In April, 1894, the defendant corporation, the Eli Pettijohn Cereal Company, was organized, pursuant to the laws of Minnesota. Eli Pettijohn became the owner of 20 shares, out of 250 shares of $100 each; that being the capital stock of said company. He was made a director, and he became—and, at the time of the hearing still was—an employé of said company. The machinery for making rolled wheat, heretofore spoken of as having been brought from California, and as having been mentioned on the labels of William A. Pettijohn, and of the Pettijohn California Breakfast Food Company, and as still being in use in the mill at Minneapolis purchased by complainant, was not seriously damaged in the fire. Said machinery was purchased by the defendant company, and, with other machinery made by Eli Pettijohn, was in use by the defendant company in its mill at Minneapolis at the time this bill was filed. The rolled wheat produced at said mill is substantially the same as the Pettijohn rolled wheat made by the complainant and its predecessors prior to said fire. The sworn answer contains the statement that defendant has expended some $25,000 in advertising the product of its mill. Defendant insists that prior to this expenditure, and prior to the commence-

ment of its business, it submitted to complainant its proposed wrapper, showing the name adopted for its product, "Eli Pettijohn's Best," together with a picture of Eli Pettijohn, and the remaining designs, colors, words, and figures, all as since used; that said proposed wrapper was in fact brought to the notice of the complainant and its officers; that they, after such notice, made no objection, until this litigation was commenced. Complainant, on the other hand, insists that its officers had in fact no notice either of the sale of the machinery or of the label; said sale having been effected by a subordinate agent of complainant, and, as to part of said machinery, to one of the incorporators of defendant company, instead of to defendant by name, and said label never having been submitted to any person authorized by complainant to consider and pass upon the same.

The cause of action in the bill is unfair competition in trade. An injunction was prayed to stop the use by defendant of the name "Pettijohn," in defendant's corporate name, and in the designation of defendant's product, and to stop the use by defendant of its wrapper, or any wrapper showing the name "Pettijohn." An ex parte injunction was granted in the state court. The cause was then removed to this court. After a somewhat prolonged contention in this court touching the validity of the service of process, which was decided adversely to the defendant, complainant moved that defendant "be punished, by fine or otherwise, as may seem proper to the court, for contempt of court in disobeying the injunction herein." Defendant appeared to that motion, and was permitted, without objection by complainant, to present at the same hearing a motion for the dissolution of said injunction.

Eli Pettijohn believed himself to be the originator of the article of food known as "rolled wheat." The record seems to show a continuing effort or purpose on his part to establish a profitable business in the manufacture or preparation of that article. He was actually engaged in that business when he went from California to Minneapolis in November, 1893, as already mentioned. It can hardly be contended that he had not then the right to make, or rather to continue making, rolled wheat, and to market the same in packages bearing his name, in any part of the United States. Neither complainant nor its assigns could, by advertising the name "Pettijohn," prevent Eli Pettijohn from doing this. It would seem to follow, also, that he might secure the co-operation of others willing to assist him financially in the business, and that he might, with such co-operation, form a corporation for the purpose of carrying on such business: provided, always, he should take reasonable precautions to distinguish the business thus carried on by him from that of a competitor rightfully using the name "Pettijohn." The defendant corporation took the name "Eli Pettijohn Cereal Company." As already stated, a picture of Eli Pettijohn appears on defendant's wrapper, and the name "Eli Pettijohn" appears in full, and in plain, large, and conspicuous type, and the product is called "Eli Pettijohn's Best." The personality of this man, as distinguished from any other Pettijohn, is made as pronounced as possible; and the

comparison obviously suggested by the word "Best" is with other like products made formerly or contemporaneously by Eli Pettijohn himself, and not by any other manufacturer, but with a suggestion of advertising puffery not uncommon, and well understood by the trading public. Assuming a right in defendant to use the name "Eli Pettijohn," I see no substantial ground of objection to defendant's wrapper. One person cannot, by colorable artifice, benefit by the trade reputation of another. Where, for instance, one man has long made ale at a place called "Stone," and has long branded his goods as "Stone Ale," another who should remove a like business to the same locality, simply for the purpose of marking his goods "Stone Ale," would be enjoined. Again, the good will of a manufacturer will be protected from a competitor who simply buys from an indifferent third person, happening to have a name identical with said manufacturer, the privilege of using that name. But William A. Pettijohn and his assigns could not, by extensively advertising the name "Pettijohn," prevent Eli Pettijohn, who has for nearly 20 years been making or selling the same product, from selling or manufacturing in any part of the United States under the name "Eli Pettijohn." So far as manufacturing and selling Pettijohn's rolled wheat is concerned, Eli Pettijohn was not an indifferent third person. To hold that he was would be plainly against the showing made here. Complainant says that, before organizing the defendant corporation, Eli Pettijohn offered to "sell his name" to complainant. This, assuming it to be true, meant nothing more than that he claimed the right to compete in the territory east of the Rocky Mountains, or in the markets available to a manufacturer at Minneapolis. He also was willing, for a price, to covenant against such competition. Said offer was in fact a notice to complainant that Eli Pettijohn supposed himself to be identified with the rolled-wheat business, and that he desired or intended to start a mill for the manufacture of that article at Minneapolis, or at some locality which would bring him into competition with the complainant. Complainant insists that retail dealers and traveling salesmen impose on the public by substituting defendant's rolled wheat for that made by complainant, and that such fraud is made possible by the use of the name "Pettijohn" by defendant. Some confusion might, no doubt, arise by the common use of this name by the two competitors, but defendant denies any instigation of frauds of this kind. I cannot hold that the wrapper used by defendant, of itself,—assuming defendant's right to use the name "Pettijohn,"—indicates any purpose of confusing one product with the other, or of playing into the hands of persons disposed to fraudulently confuse the one product with the other.

Whatever ought to be the ruling as to the matters already spoken of, there is another point in the case which seems to me decisive. Rolled wheat is an article made at divers mills in this country. Each mill appears to indicate its own product by its own peculiar markings. Each mill, in this way, preserves the identity of its own product, and commends it to the public,—in other words, retains its own patronage or good will. Several of these mills, as already stated,—two, at least, in Ohio, one at Chicago, and one in Iowa,—are

owned by complainant. After the destruction of its Pettijohn mill at Minneapolis, complainant ceased to manufacture in that city. As already mentioned, it thenceforward supplied the patronage of the Minneapolis mill with the product of the mills in Ohio, at Chicago, and in Iowa. It used the same boxes and wrappers as had been used at the Minnesota mill, but left off the words "Minneapolis, Minnesota," without specifying any other place, or indicating in any manner the mill from which the product came. The machinery brought from California, and used, up to the fire, in making the "Pettijohn California Breakfast Food," was sold, as has been already stated, to defendant, and by defendant was, and apparently is still, used to make the rolled wheat now called "Eli Pettijohn's Best." The specific complaint is that the public buy the latter product, believing that complainant's mill is still running at Minneapolis, and that said product is made by complainant at said mill; in other words, so far as the good will bought by complainant from the Pettijohn California Breakfast Food Company depends on the belief by the trading public that said product is still made at the original Pettijohn mill in Minnesota, defendant trespasses on the same. It may be that the rolled wheat produced at complainant's mills at Akron, Ohio, for instance, is just as good as, or even better than, that made by William A. Pettijohn and his successors at the original Pettijohn mill in Minneapolis. But the product of the mill at Akron, Ohio, is not the product of the Pettijohn mill at Minneapolis. It is not the "Pettijohn California Breakfast Food," as understood in the trade up to the time when the good will of the Minneapolis mill was purchased by complainant. A court of chancery cannot preserve for complainant the benefit of an impression on the trading public which no longer has any basis of fact. I cannot declare a right in complainant to have people continue in the belief that the "Pettijohn California Breakfast Food" now marketed by it, is made at a Minneapolis mill. The injunction is dissolved, and in view of this ruling, and of the circumstances of the case, the contempt proceeding may be dismissed.