### KOPPEL INDUSTRIAL CAR & EQUIPMENT CO. v. ORENSTEIN & KOPPEL AKTIENGESELLSCHAFT et al.

(Circuit Court of Appeals, Second Circuit. March 13, 1923.)

No. 143.

1. **War ⬥12—Government has ample constitutional power to seize and sequester alien enemy property.**

   The provisions of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.) are constitutional and effective; it being now unquestioned that Congress in time of war may authorize and provide for the seizure and sequestration through executive channels of property believed to be enemy owned, if adeqate provisions be made for return in case of mistake.

2. **War ⬥12—Conveyance of alien enemy property entitled to equity protection to same extent as if conveyance voluntarily by owner.**

   Where the American business, property, and good will of a German manufacturing corporation were seized and sold by the Alien Property Custodian under section 12 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), the purchaser took by conveyance the exclusive right to carry on the business in the United States and was entitled to protection against unfair competition by the foreign company to exactly the same extent as if the sale had been made by the German corporation to the purchaser.

3. **War ⬥12—Purchasers from Alien Property Custodian entitled to injunction to protect owners from unfair competition.**

   The purchasers from the Alien Property Custodian of the manufacturing business, property and good will of the American business of a German corporation *held* entitled to injunction to prevent the parent German company from using trade-marks, symbols, and advertising methods, pretending to represent itself as continuing the business sold, and tending to make the public and especially its former customers believe that defendants were continuing the old business, which had been sold to plaintiffs by the Custodian.

Appeal from the District Court of the United States for the Southern District of New York.

Injunction by the Koppel Industrial Car & Equipment Company against the Orenstein & Koppel Aktiengesellschaft, the Orenstein & Koppel Company, Limited, and others. Decree for defendants, and complainant appeals. Reversed.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Larkin, Rathbone & Perry, of New York City, and Reed, Smith, Shaw & McClay, of Pittsburgh, Pa. (Albert Stickney, of New York City, Robert J. Dodds, of Pittsburgh, Pa., and Alfred W. Kiddle, of New York City, of counsel), for appellant.

Duer & Taylor and Hays, St. John & Moore, all of New York City (Geo. Winship Taylor, Leland B. Duer, and Arthur Garfield Hays, all of New York City, of counsel), for appellees.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. On September 12, 1918, the Alien Property Custodian sold the American business and good will as a going concern of a German corporation known as Orenstein & Koppel-Arthur Koppel, A. G. This German corporation owned and operated in the town of Koppel, Pa., a large plant, where it manufactured smaller types of railway or industrial material and equipment. It maintained an office at No. 30 Church street, New York City, and other offices in the principal cities of the United States. It carried on a large and profitable business in the manufacture and sale of its products, and had the reputation of being the largest American manufacturer and seller of such railway and industrial material and equipment. It began business in 1897, at Koppel, Pa., and in 1909 authority was obtained from the state of Pennsylvania to transact its business under the name of the Orenstein-Arthur Koppel Company. It also organized an American subsidiary corporation, known as the Orenstein-Arthur Koppel Company, under the laws of the state of Pennsylvania; but it is denied by affidavit that this Pennsylvania corporation transacted business after its organization. It is admitted that the German corporation did business by virtue of the license granted to it by the state of Pennsylvania in the name of Orenstein-Arthur Koppel Company. The name was used in its American catalogues, its advertisements, and its trade circulars. It used a trade-mark symbol "O A K," which signified Orenstein-Arthur Koppel Company, and this was displayed on its catalogues and circulars. The name and the symbol identify solely the American business of the German company, as well as the business transacted in other English speaking countries.

The fact appears to be that the American catalogue No. 850 of the company—in pre-war days and by the appellant since—used the name Orenstein-Arthur Koppel Company with the descriptive trade mark O A K, and in other English speaking countries other than America the company was referred to as the Orenstein & Koppel-Arthur Koppel Amalgamated, and the descriptive trade-mark used was O K A K. The catalogue used in America mentioned the officers of the company located in the United States and its territory, whereas the European catalogue mentioned London as the company's headquarters and referred to various European plants of the company. The largest agency of the American branch was located at No. 30 Church street, New York City, and at the Rialto Building, San Francisco, Cal. The American business was practically independent of the German business. The works in Pennsylvania supplied the entire American trade, excepting locomotives, which were not manufactured at Koppel. This plant also

supplied the West Indies, South America, and the Philippine Islands trade of the company. During the war period, it was operated independently, and was also assigned to take care of the Japanese and South American trade.

Section 12 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff) vested the Alien Property Custodian with all the powers of the common-law trustee in respect to all property other than money which has been or shall be required to be conveyed, transferred, assigned, delivered, or paid over to him in pursuance to the provisions of the act, and it gave him power to manage such property and do any act or things in respect thereof or make any disposition thereof, or of any part thereof, by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto or to the ownership thereof in like manner as though he were the absolute owner thereof. It provides for the sale to American citizens at public auction and to the highest bidder, after public advertising of the time and place of sale, and this to be where the property or the major portion thereof is situated, unless the President, stating the reasons therefor, in the public interest shall otherwise determine. It is provided that the proceeds be deposited in the Treasury of the United States of any such property or rights so sold by him, and at the end of the war any claim of an enemy or ally of an enemy to any money or other property received and held by the Alien Property Custodian or deposited in the United States Treasury shall be settled as Congress shall direct. The sole relief and remedy of any person having any claim to any money or other property conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian "shall be that provided by the terms of this act." In the event of sale or other disposition of property by the Alien Property Custodian, it shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States.

An executive order, under date of February 26, 1918, was made, providing that the Alien Property Custodian may sell and deliver any rights appurtenant to the ownership of corporate stock, shares or certificates of beneficial interests in cases, where such rights would lapse unless exercised within a limited time, and it provides that—

"The Alien Property Custodian may manage, conduct and operate any business belonging to or held for, by, on account of, or on behalf of or for the benefit of an enemy, in cases where the continuation of such business may seem to be necessary to prevent waste or, to protect such business, and the Alien Property Custodian may sell or otherwise dispose of such business or any part thereof, or the assets or any part thereof, whenever such sale shall seem to be necessary to prevent waste or to protect such business. and in the management, operation, conduct, sale or other disposition of such business the Alien Property Custodian may exercise every right, power, and authority of the enemy."

It was determined on June 15, 1918, by executive order, that Orenstein & Koppel-Arthur Koppel Aktiengesellschaft was an enemy within the purview of the Trading with the Enemy Act. The Alien Property Custodian on September 12, 1918, after having taken possession of all its property, offered it at public auction, and the appellant became the

purchaser for $1,312,000. The deed of this conveyance from the Alien Property Custodian provided:

"All and singular, the money and property, real and personal, tangible and intangible, rights, claims, titles, interests, effects and assets of every kind and description whatsoever, wheresoever situate in the United States, as defined in the 'Trading with the Enemy Act' (excluding, however, accounts and notes receivable, claims, choses in action, money, cash and deposits in bank), and all incidents and appurtenances thereto, including the business as a going concern and the good will belonging to or owned, possessed, held and enjoyed by, in the name of, or on behalf of, the following and each of them, namely: 'Orenstein & Koppel-Arthur Koppel Aktiengesellschaft, registered under the laws of Pennsylvania as Orenstein-Arthur Koppel Company; Koppel Land Company, Beaver Connecting Railroad Company, Koppel Water Company, Pennsylvania Car & Manufacturing Company, Orenstein-Arthur Koppel Company, a corporation of Pennsylvania; Universal Railway Products Company, Koppel Sales Company.' "

There was conveyed the plant at Koppel, Pa., the shares of stock in the charter of the Orenstein-Arthur Koppel Company, all registered trade-marks, trade-names, and designs owned or used by any of the companies. No property of the German corporation as such was conveyed, excepting the American property, business, and good will. After such purchase at such public auction, the appellant entered upon the manufacture and the carrying on of the American business. It maintained the selling agencies in the United States which had been operated by the German companies and continued the use of the catalogues and trade circulars, including catalogue No. 850, and the use of the name "Orenstein-Arthur Koppel Company" and the trade-mark symbol O A K, although it had organized under the name of the Koppel Industrial Car & Equipment Company.

In 1920 the German corporation attempted to reorganize its business in the United States, through the appellees Hellman and Joseph, who were formerly agents and who now became agents for the German corporation in this business. During the war these gentlemen were interned as dangerous enemy aliens. Since then they have become American citizens. They opened an office at No. 30 Church street, New York City, and in the Rialto Building in San Francisco, Cal., and the German corporation now advertises itself in the San Francisco telephone directory under the name of Koppel-Orenstein & Koppel and Orenstein & Koppel, Limited. They solicit customers from the offices in both cities. In March, 1920, the German company changed its name to Orenstein & Koppel, A. G. This change of name was practically identical with the name used in conducting the American business in pre-war times. A reasonable inference to be drawn from this change of name is that the German corporation is seeking to obtain the business flowing from the good will formerly had in this country, and this would be in direct competition with the appellant. Other circumstances indicate the effort to recapture the business which it has lost, and to take away from the appellant that which it secured in the purchase from the Alien Property Custodian. Its American headquarters are located in the same building in New York City and in San Francisco, where its principal sales offices were conducted theretofore. It is endeavoring to sell the same supplies and industrial and railway

289 F.—29

equipment of the type and sizes which were being manufactured by the appellant in Koppel, Pa. It is soliciting the customers of the appellant, and some of these were formerly the customers of the German corporation. Representations are made to customers that it is the successor of the Orenstein-Arthur Koppel Company. This conduct indicates knowledge on the part of the agents in this country of the list of appellant's customers. It is able, because of labor conditions in Germany, to undersell the appellant. Instances of solicitation are set forth in the affidavits which show that Hellman forwarded catalogue No. 850, as well as No. 863 of the Orenstein-Koppel Co. of Berlin and Mexico, to a prospective customer, and catalogue No. 850 bore on the cover the inscription "Orenstein-Arthur Koppel Company." The affidavits are sufficient in the statement of instances and incidents indicating that the appellees are endeavoring to recapture the business which was sold by the Alien Property Custodian as claimed by the appellant.

[1] The question presented is whether such competition, in view of such sale, entitled the appellant to the aid of the court of equity by way of injunctive relief. It cannot now be questioned that the provisions of the Trading with the Enemy Act are constitutional and are now effective. Central Trust Co. v. Garvan, 254 U. S. 554, 41 Sup. Ct. 214, 65 L. Ed. 403; Stoehr v. Wallace, 255 U. S. 239, 41 Sup. Ct. 293, 65 L. Ed. 604; Garvan v. $20,000 Bonds (C. C. A.) 265 Fed. 477. That Congress in time of war may authorize and provide for the seizure and sequestration, through executive channels, of property believed to be enemy owned, if adequate provision be made for return in case of mistake, is not debatable. Central Trust Co. v. Garvan, supra.

"The Trading with the Enemy Act, whether taken as originally enacted October 6, 1917 (40 Stat. 411, c. 106), or as since amended March 28, 1918 (40 Stat. 459, 460, c. 28), November 4, 1918 (40 Stat. 1020, c. 201), July 11, 1919 (41 Stat. 35, c. 6), June 5, 1920 (41 Stat. 977, c. 241), is strictly a war measure and finds its sanction in the constitutional provision (article 1, § 8, cl. 11) empowering Congress 'to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water.'" Stoehr v. Wallace, 255 U. S. 239, 242, 41 Sup. Ct. 293, 295 (65 L. Ed. 604).

It was the apparent intention of Congress to sell enemy property as fully as the owner thereof could sell. This was deemed necessary as a war measure. In the case of a going concern, which owned good will or trade-marks, it was clearly intended that these concerns should be kept going in order to engage in manufacturing or other enterprises which might be needed for the welfare of our country during this period; and it had the other purpose of crippling the enemy to the extent of preventing the enemy from enjoying its property or its profits during such period. Likewise, it was the intention of Congress that the American citizen, who was authorized to purchase at public sale, should, if the terms of sale so provided, be able to buy and enjoy his purchase as a going concern, thereby obtaining all that the German proprietorship consisted of at the time of sale. The language of the Trading with the Enemy Act clearly embraces this power of sale. To permit of the sale of the physical property only would have deprived the purchaser in the instant case of the great value of the good will

of the German corporation, which had made its business and its growth during the preceding years. The conveyance by the bill of sale as referred to, conveyed "the business as a going concern and the good will," together with "all registered and unregistered trade-marks * * * trade-names and the like," and "all privileges, franchises, and rights of every kind," owned by the German corporation and its subsidiaries in the United States.

[2] We think this conveyed to the purchaser the exclusive right to carry on the business in the United States, with the right of protection of a court of equity from interference by the German corporation; for, if the present interference be permitted, what was conveyed would in time be destroyed. The sale was as complete as if it were a voluntary conveyance of its interests in the United States by the German corporation. It is not the case of a sale in invitum of the good will and business. Assuming a voluntary sale of its good will and business had been made by the German corporation, would it have been at liberty later to impair the good will by seeking the customers of the buyer and carrying on business, using substantially the same trade-name and trade symbol as they had theretofore used? We think not.

In The Peck Bros. & Co. v. Peck Bros. Co., 113 Fed. 291, 51 C. C. A. 251, 62 L. R. A. 81, a similar question was presented to the Circuit Court of Appeals for the Seventh Circuit. There, receivers of a manufacturing corporation, after continuing the business until, by order of the court, the entire property, good will, trade-marks, etc., of the company were ordered sold to a committee representing all the stockholders, reorganized under the name of "The Peck Bros. & Co.," dissolving the old corporation. Prior to the receivership, the company maintained a branch office in Chicago, Ill., and this was in charge of three stockholders, one of whom was by name Peck, and he was vice president of the company and one of the complainants in the receivership suit. Another of the number was appointed ancillary receiver of the Chicago property. Pending the receivership, such parties, joined by an attorney for the receivers, procured a charter from the state of Illinois for a corporation known as Peck Bros. Co., and it engaged in the same business.

The new company purchased the Chicago stock of the old, but not its good will. There was but one person named Peck. Both companies continued in business in the same territory and a confusion of goods resulted, owing to the similarity of name with which such goods were stamped. The court granted an injunction, holding that using the name of Peck Bros. Company was for the fraudulent purpose of obtaining advantage of the reputation and established trade of the old company, and in violation of the duty which its organizers owed to the old company as stockholders. It was held that carrying on a business thereunder in the manner shown constituted competition. And it was further held that a sale by a decree of the court of all the property of a manufacturing or commercial corporation, including its franchises, name, and good will, to a reorganized committee representing all its stockholders, passes to the purchasers and the reorganized company the right of the company's trade-name and to protection in its exclusive

use to the same extent that such protection could have been invoked by the old company had it continued in business.

In S. F. Myers Co. v. Tuttle (C. C.) 183 Fed. 235, a case in the District Court for the Southern District of New York, Judge Holt ruled that the purchaser of assets, good will, and corporate good name at a bankruptcy sale, could maintain an action in equity restraining the sons of the principal stockholder of the bankrupt concern from carrying on a company known as Myers Company which was organized subsequent to the bankruptcy, and which attempted to carry on a similar business to that previously carried on by the bankrupt. We approve the reason for that decision where it is said:

"He purchased the good will, the outstanding accounts, the subscription lists, and about three-quarters of the tangible assets, paying for them many thousand dollars. I think he was substantially the purchaser of the business as a going concern and he is entitled to carry on the business without interference or piracy on the part of the Myerses." Page 237.

[3] After the sale, in this instance, of the good will of the German corporation's business, it had no right to represent itself as carrying on that business which had been sold or to use its trade-marks or symbols or to represent itself as a continuer of that business in this country. The avenue of relief to it for what it lost, through the fortunes of war, is some future action by the Congress, and this is made clear by the statute. This is the only relief the German corporation can look forward to. It had no right to change its name, and then have its representatives solicit the business in this country, using such name and such means as before described in seeking the business. It could not attempt to make the public believe that it was the same business, nor could it advise customers in such a way as to impress them that they were continuing the old business, which ceased by reason of the seizure by the Alien Property Custodian.

The language of Justice Holmes in the recent case of A. Bourjois & Co. v. Katzel, 43 Sup. Ct. 244, 67 L. Ed. ——, instituted for infringement of trade-mark (decided January 29, 1923), is pertinent. There he said:

"After the sale the French manufacturers could not have come to the United States and have used their old marks in competition with the plaintiff. * * * If for the purpose of evading the effect of the transfer it had arranged with the defendant that she should sell with the old label, we suppose that no one would doubt that the contrivance must fail. There is no such conspiracy here, but apart from the opening of a door to one, the vendors could not convey their goods free from the restriction to which the vendors were subject. Ownership of the goods does not carry the right to sell them with a specific mark. It does not necessarily carry the right to sell them at all in a given place."

We think that an injunction should be granted as prayed for in the order to show cause issued in the District Court.

Order reversed.