**MULHENS & KROPFF, Inc., v. FERD MUELHENS, Inc.**

District Court, S. D. New York.
October 9, 1929.

See also 22 F.(2d) 191.

Manvel Whittemore, of New York City (Lucius E. Varney and Manvel Whittemore, both of New York City, of counsel), for plaintiff.

Katz & Sommerich, of New York City (Maxwell C. Katz, Otto C. Sommerich, Edwin M. Borchard, and Raymond T. Heilpern, all of New York City, of counsel), for defendant.

MACK, Circuit Judge.

Action for a permanent injunction to restrain defendant from selling eau de cologne and other articles bearing the registered trade-mark "4711" and/or publishing statements that it is selling the only genuine "4711" eau de cologne and cologne products, or otherwise directly or indirectly interfering with the sale of plaintiff's "4711" eau de cologne and other toilet articles. Jurisdiction is based on Federal registration of the trade-mark. The record establishes in my judgment the following facts:

Since 1792 the Muelhens family has been engaged in manufacturing eau de cologne at 4711 Glockengasse, Cologne, Germany, from essential oils dissolved in the proper amount of alcohol and water, pursuant to a recipe transmitted from father to son and kept secret at all times. The fact that the recipe is kept secret is stated on all labels, the product has been extensively advertised, and the business has become world-wide under the mark "4711."

William Kropff, through whom plaintiff claims title to the trade-mark, came to the United States about 1878 for the purpose of establishing, in partnership with Julius Muelhens of Germany, a distributing agency for the sale of the products of the House of Muelhens. By way of preparation, Kropff worked for a short time in the factory at Cologne and became familiar with the bottling and compounding of the various products, that is, with the mixing of the prepared essences with alcohol and water, filtering, etc.; but he did not acquire a knowledge of the secret recipe. Because of the high tariff on the finished product, the American agency began in 1879 to manufacture "4711" products by mixing the prepared essences, sent from Cologne, with water and alcohol procured in America, and this product was bottled and marketed under a white and gold label as distinguished from the blue and gold label on the German product. The first two shipments of essences were in the form of eight essential oils; plaintiff's witness Kropff testified that they were distinctly marked as to character and weight and therefore indicative of the secret recipe. All subsequent shipments, however, were of the mixed essences under the shipping name of "Cedrat." The selling arrangement was confirmed by a contract entered into in 1881 between the House of Muelhens and the firm of Muelhens & Kropff, whereby the American firm was given authority to use all labels and trade-marks, and "to have them registered, without prejudice, however, to the continued sole proprietorship of Ferdinand Muelhens. * * * *" Muelhens also reserved the right to withdraw this authority and cancel the registration. Under this agreement, the mark "4711" was registered in 1882.

In 1889 a partnership was formed between William Kropff of New York and Ferdinand Muelhens of Germany, Julius Muelhens having retired, by the terms of which agreement the secret recipe remained in Muelhens and Kropff obtained no right to learn it; Muelhens reserved the right to take over the business in the event of dissolution. While this agreement was in force, the mark "4711" was re-registered in 1905, and it is on this registration that jurisdiction is based.

The business of the American partnership expanded rapidly until the advent of the European War made it very difficult to procure the mixed essences from Germany. This difficulty increased between 1915 and 1917, and Kropff in America repeatedly asked that he be intrusted with the secret recipe; but Muelhens refused to send it. Shortly after the United States entered the war, Kropff, acting on the theory that the declaration of war effected a dissolution of the partnership, filed with the clerk of New York county a certificate stating that he was doing business under the name of Mulhens & Kropff "as successor in interest," and thereafter continued the business until the assignment to plaintiff.

Pursuant to the Trading with the Enemy Act in force October 6, 1917 (50 USCA Appendix § 1 et seq.), William Kropff on December 3, 1917, filed with the Alien Property Custodian a report in which he claimed that under the partnership agreement of 1889 he had the right for the duration of the war to continue the business for his sole individual benefit, subject to the payment of interest on the capital contributed by his German partner. On May 6, 1918, the Alien Property Custodian demanded that the entire interest of Ferdinand Muelhens in the firm of Mulhens & Kropff be turned over to him. In order to enable him to liquidate Muelhens' interest, Kropff, an American citizen resident in New York, was licensed June 13, 1918, to continue the business for this purpose. While this license was in effect, demand was served on Kropff, on September 21, 1918, and a supplementary demand on November 11, 1918, that all the rights of Ferdinand Muelhens under the partnership agreement be conveyed to the Custodian; on May 8, 1919, a final demand specifically enumerated the trade-marks including "4711" and purported to seize Ferdinand Muelhens' interest in them subject to the rights, if any, of Kropff.

On September 15, 1919, William Kropff, who in the meantime had been continuing the business on his own account, entered into an agreement with the Alien Property Custodian whereby, in consideration of $70,125 paid by Kropff, the Custodian on February 3, 1920, conveyed to him the entire seized interest of Ferdinand Muelhens in the partnership of Mulhens & Kropff, together with all rights to the trade-marks. Inasmuch as this was a private sale and the act (50 USCA appendix § 12) required a public sale "unless the President stating the reasons therefor, in the public interest shall otherwise determine," a presidential order was obtained two years later on March 29, 1922, which order gave authority "to sell at private sale," for the reasons as therein stated: (1) To more effectually secure to and vest title in Kropff; (2) the proposed sale to Kropff is in the public interest. Pursuant to this authority, the then Custodian made a formal conveyance on August 29, 1923, of the above-mentioned interests, which conveyance recited the former sale, the defect, and the executive order. All of these demands and conveyances were properly recorded in the Patent Office.

Subsequently William Kropff assigned the trade-marks and good will to plaintiff corporation; it continued to market its products under the "4711" label with the statement thereon that they were prepared in accordance with the original recipe. Prior to 1927, the House of Muelhens established defendant, a New York corporation, as its American selling agent, for the sale of its "4711" products.

In denying a motion for a preliminary injunction to enjoin sales of "4711" products by defendant, I held, on the evidence then before me, that William Kropff had never acquired knowledge of the secret recipe; further, that if he had such knowledge, he had acquired it in his capacity as agent with full knowledge that his German principal intended to preserve its secrecy; that in any event he had not transferred it to the Alien Property Custodian; that Ferdinand Muelhens had not by virtue of the forced sale of the trade-marks come under any implied obligation to disclose the recipe; and that while the products of the respective parties were very similar, they were not identical. The conclusion was that plaintiff was palming off a substitute article under what then appeared to be a false claim that it was identical with the original and was doing so under the false allegation implying knowledge of the secret.

Plaintiff now contends: (1) That it has proved prima facie ownership of the trade-mark by showing the seizure by the Alien Property Custodian, the conveyance to Kropff, and the latter's assignment to it; (2) that it is not barred by the defense of unclean hands, because (a) after the denial of the preliminary injunction, it ceased advertising that it manufactured its products in accordance with the original recipe, (b) the evidence of its chemical expert together with that of William Kropff proves that it has knowledge of the secret recipe, and (c) the burden of showing unclean hands, which it asserts is on the defendant, has not been sustained; and (3) that since infringement is clear, its prima facie ownership of the reg-

istered trade-mark entitles it to injunctive relief.

Defendant maintains: (1) That plaintiff has no title to the trade-mark because (a) there never was a valid seizure of the interest of Ferdinand Muelhens in the partnership of Muelhens & Kropff, (b) that the absence of any presidential order made the original sale invalid, (c) that the subsequent presidential order was invalid, in that it stated no reasons in the public interest for a private sale, and in any event it could not validate a sale theretofore made; (2) that if a third party would have obtained good title through the sale, nevertheless Kropff as a liquidating partner could not purchase free of the rights of Ferdinand Muelhens; (3) that the secret recipe was never seized by the Alien Property Custodian, and thus Kropff did not acquire it by a conveyance from the former; (4) that as a matter of law, a trade-mark used on a product manufactured according to a secret recipe cannot be assigned to one ignorant of such recipe; (5) that William Kropff never had the secret recipe, and that plaintiff is guilty of a fraud upon the public in representing that its product is manufactured in accordance with it; (6) that even if William Kropff acquired the secret recipe, he obtained it as a fiduciary, and consequently could neither use it for his own advantage nor assign it to one having knowledge of the facts; (7) that plaintiff's change of the original formula of "4711" eau de cologne deprives it of any right to use the trade-mark; and (8) that public policy requires that relief be denied in the situation presented by the instant case.

■ 1. The essential question of fact in dispute is whether or not Kropff and, through him, the plaintiff, possess the secret recipe for "4711" eau de cologne. The evidence on this point may conveniently be classified into three groups: First, the testimony of chemical experts as to the identity or nonidentity of the products; second, Kropff's story as to the manner in which he learned and recorded the secret recipe from the two shipments in 1879; and, third, other evidence bearing upon the fact of knowledge.

■ An intensive examination of the testimony of the respective experts, and a study of the theories upon which it is based, has convinced me that as to these products it is impossible by chemical analysis to establish identity or nonidentity of composition or to demonstrate satisfactorily whether or not the same recipe was used. Dr. Wimmer, plaintiff's expert, in his affidavit on the motion for a preliminary injunction stated that he could not determine at that time whether identical essential oils were combined in identical proportions in the two products. Later he made a number of very ingenious and rather complicated tests which established to his satisfaction that the probability of different formulæ having been used was highly remote. Nevertheless, I am not satisfied that any one or all of these tests demonstrate that plaintiff is using the original recipe. Variable factors and the possibility of error—in the initial process of salting out equal to almost 10 per cent.—are too great. At best, Dr. Wimmer's testimony shows that probably very similar quantities of essential oils were used; yet he admitted that differences in quality, which is an essential element in perfumery, or differences in the origin of the same kind of oils, would not appear in his results. The volatility test is not convincing in the light of testimony that the presence or absence of highly important esters, the odor carrying ingredient, would not affect the result; moreover, the differences indicated on his charts are not slight. The tests showing ester numbers and ester content in terms of linalyl acetate are based, as I understand them, on the probability that assuming each product contained at least 95 per cent. linalyl acetate out of the total ester content, similarities in ester percentage (in terms of linalyl acetate) for the remaining 5 per cent. would indicate that oils containing the same esters, or group of esters, had been used. Both this test and that showing alcohol content in terms of linalol (based on a somewhat similar theory) have some value, but they are not sufficient. Dr. Wimmer further testified that the variations which his tests showed were due merely to differences in the individual oils used, reflecting differences in climate, locality, and processes of extraction. This may well be. But the conflict in the testimony of the respective experts is such that with the admission that in the case of perfumes, analysis cannot yield the exact recipe, I am of the opinion that plaintiff has not established the use by it of the original recipe. The two products may be and are closely similar, but they apparently are not identical; while plaintiff may have a part of the secret, it has not the complete recipe. Defendant is under no duty, in the circumstances, to disclose its secret recipe for examination, even *in camera*, and for comparison with that offered by plaintiff; the burden of showing that it has the recipe rests on plaintiff.

I proceed then to an examination of the second line of evidence upon which plaintiff bases its claim to knowledge of the recipe. Kropff testified that the invoice (now no longer available) for the shipment to him in 1879 contained the names and weights of the eight separate oils making up "4711" eau de cologne; further, that this information was entered by him in his calculation book and on a memorandum sheet now lost; that after checking the labels and weights of the shipment to the memorandum, he placed the latter in his safe; that the formula entered thereon was transcribed in his recipe book some twenty years later; and that in 1917 when essences from Germany were no longer available, he used this recipe, which he believed was identical with that employed by Muelhens. Kropff was thoroughly cross-examined as to his recollection of these fifty year old events, and a number of inconsistencies were developed, particularly between the statements in his affidavit on the motion for a preliminary injunction and his testimony as to whether his knowledge of the recipe was obtained from the first or second shipment. It is neither feasible nor necessary to detail here the difficulties encountered in reconciling the many inconsistencies in Kropff's own testimony, in accepting the accuracy of his recipe in the light of the testimony of defendant's witness Schuette of Cologne, that two of the oils therein listed, "Limette" and "Petit Grain," are not used in the genuine "4711" (something he might well know even though he did not know the recipe itself), or in understanding the reasons given for the delayed and dubious entries in the recipe book. That the House of Muelhens would, through the weight and names and quantities of the essential oils, have given at least an excellent opportunity to learn a secret zealously guarded for a century, is difficult to believe. That Kropff had a knowledge of the secret for fifty years before using it is, in view of the contract of 1889 and his subsequent action, hereinafter considered, inherently improbable. While Kropff's oral testimony in the light of his age and condition did not impress me as unfavorably as did his affidavit at the hearing on the preliminary motion, I am of the opinion that he did not acquire the secret recipe from either the first or second shipment of oils in 1879. It is therefore unnecessary to consider the effect of his agency and fiduciary position on the use of knowledge so acquired.

Strongly corroborative of this conclusion of fact are Kropff's letters sent to Muelhens after the outbreak of and before our entry into the World War. In these, Kropff repeatedly stated the difficulty he was having in getting only a limited supply of "Essence M," the secret combination of the essential oils in "4711" products, and requested Muelhens to intrust the recipe to him. These letters, in addition, reveal how Kropff secured this "Essence M" and other oils by transshipment through neutral countries. His assertion in the letters that he could procure all necessary oils in America if he knew the recipe, while he was thus endeavoring through subterfuges to get the German goods and while he was continuously appealing for the recipe itself, strengthens the conviction that he did not have it. Moreover, when in 1922 a representative of Muelhens conferred with Kropff in an endeavor to effect a reconciliation, the latter, without asserting that he had the recipe, merely stated that perhaps his own eau de cologne was better than the original.

2. Before determining the effect of the declaration of war and the demands of the Alien Property Custodian, I come to a consideration of the legal rights of the parties prior thereto, in and to this trade-mark. Registration does not increase and cannot control the ultimate determination of common-law rights in a trade-mark; its territorial extent, United Drug Co. v. Rectanus Co., 248 U. S. 90, 39 S. Ct. 48, 63 L. Ed. 141, validity of use, Spiegel v. Zuckerman, 188 F. 63 (C. C. A. 2d), and ownership, Lawrence-Williams Co. v. Société Enfants Gombault et Cie., 22 F.(2d) 512 (C. C. A. 6th), are all subject to inquiry. Cf. U. S. Printing Co. v. Griggs, Cooper & Co., 279 U. S. 156, 49 S. Ct. 267, 73 L. Ed. 650. Although historically a trade-mark indicated ownership and origin, the development of this branch of the law has emphasized that the interest to be protected is primarily the good will of the owner or licensee, be he manufacturer or dealer. See Schechter, The Historical Foundations of the Law Relating to Trade-Marks, 146–171. A trade-mark is, however, not only a symbol of *existing* good will: as Justice Holmes says, "Primarily it is a distinguishable token devised or picked out with the intent to appropriate it to a particular class of goods and with the hope that it *will come* to symbolize good will." Beech-Nut Packing Co. v. Lorillard Co., 273 U. S. 629, 632, 47 S. Ct. 481, 482, 71 L. Ed. 810. Source or ownership may be anonymous; the mark itself often sells the goods. In time it may come to denote to the public a product of a certain quality or grade or formula whether secret or public. See Walter Baker & Co. v. Slack

(C. C. A.) 130 F. 514, 518; Coca-Cola Co. v. Koke, 254 U. S. 143, 146, 41 S. Ct. 113, 65 L. Ed. 189; Powell v. Birmingham Vinegar Brewery Co., Ltd., 13 Rep. Pat. Cas. 235, 250. It has been long-established law that there is no such thing as a trade-mark in gross. United Drug Co. v. Rectanus Co., supra; Hopkins, Trade-Marks, § 15; Nims, Unfair Competition and Trade-Marks, 454. Therefore a trade-mark cannot be assigned apart from the good will of the business to which it appertains. Standard Brewery Co. v. Interboro Brewing Co. (C. C. A.) 229 F. 543. See 15 USCA § 90 and cases cited.

■ If the trade-mark indicates an article manufactured in accordance with a secret recipe, the good will established thereunder and entitled to protection is ordinarily that of a rightful manufacture and/or sale of articles made pursuant to and thus with knowledge of such secret recipe, (Cotton v. Gillard, 44 L. J. Ch. 90; cf. Baglin v. Cusenier Co., 221 U. S. 580, 31 S. Ct. 669, 55 L. Ed. 863; Lecouturier v. Rey, [1910] A. C. 262; Hopkins, Trade-Marks, 31) just as the right to use a trade-mark indicating a patented process is dependent upon the licensed use of the process. See Hoffman v. Kuppenheimer (C. C.) 183 F. 597. The manufacturer of the product under the secret recipe, the knowledge of which is retained by him, may by his trade therein obtain trade-mark protection: the registration of the trade-mark, with the manufacturer's consent, by and in the name of one who is selling the product under a territorial license, inures to the benefit of the parties according to their respective interests, that is, to the manufacturer as owner, to the licensee for the period of his trade license. See Lawrence-Williams Co. v. Société Enfants Gombault et Cie., 22 F.(2d) 512 (C. C. A. 6th); Waterproofing Co. v. Hydrolithic Cement Co., 153 App. Div. 47, 138 N. Y. S. 265.

■ Under the agreement of 1881, between Ferdinand Muelhens and the firm of Muelhens & Kropff, the latter was permitted to register, and as distributor to use, the trademark; ownership remained, however, in Muelhens. See Kidd v. Johnson, 100 U. S. 617, 25 L. Ed. 769. The 1889 partnership contract gave only an extension of the license; this, in my judgment, is clearly indicated by the nonrevelation of the secret recipe to Kropff, the obligation imposed upon the firm to buy the essences from Muelhens, and the reservation and reversion to him of all recipes and secrets in the event of dissolution. Therefore the registration of the trade-

mark in 1905 by the firm of Muelhens & Kropff likewise inured to the benefit of Muelhens as owner and of the firm as licensee for the duration of the partnership. It follows that upon dissolution of the partnership, Muelhens individually was and remained such owner subject only to whatever license rights the dissolved partnership, or the liquidating partner as such, had therein for firm liquidation proceedings.

■ 3. The declaration of war by the United States effected a dissolution of the partnership. Sutherland v. Mayer, 271 U. S. 272, 46 S. Ct. 538, 70 L. Ed. 943. By virtue of the first three demands, the Alien Property Custodian succeeded to the interest of Ferdinand Muelhens in the dissolved partnership; the Custodian and Kropff were entitled to share in the proceeds of the liquidation of the firm assets.

These, however, as heretofore stated, did not include the trade-mark but only a license thereunder to dispose of trade-marked goods on hand; ownership of the trade-mark remained in Muelhens, the owner of the secret recipe and the potential good will of any business in "4711" products which might thereafter be established in the United States. This property of Muelhens in the United States trade-mark was property in this country and therefore subject to seizure. The secret recipe, however, had a different status. The partnership as such never had any legal or equitable interest therein or rights thereto. As the property of Muelhens alone, it was not in any sense in the United States but in Germany; it therefore was not subject to seizure here. Cf. Baglin v. Cusenier Co., 221 U. S. 580, 595, 31 S. Ct. 669, 55 L. Ed. 863. Accordingly, while the final demand of May 8, 1919, did in terms seize the United States trade-mark together with the good will of Muelhens in this country, it could not, and indeed it did not purport to, seize the secret recipe.

4. We come, then, to a consideration of Kropff's dealings with the Custodian, and that in two aspects: (a) Whether in the circumstances a private sale ratified or authorized by the presidential order in question could convey title to Kropff; and (b) whether the nature of the property seized was such that the trade-mark without the secret process could be effectively transferred, and, if so, the effect of such a transfer.

■ (a) I cannot agree with defendant's contention that there was no valid demand for and seizure of the United States trademarks. The demand of May 8, 1919, specifi-

cally purported to seize the trade-marks "held for, or on account of, or on behalf of, or for the benefit of, said enemy, the said Ferdinand Muelhens." This specifically covered, not his partnership interest, but his individual property; it therefore included his United States trade-mark "4711" and the potential good will of any business by Muelhens in the goods to which it appertained.

 Furthermore, in my judgment full power is given to the President by the act to determine whether or not a private sale is in the public interest. The statutory requirement is that he state his reasons for a private as against a public sale; he is not required to state the reasons for his determination that such a sale is in the public interest. In any event, however, his determination that for any reason satisfactory to him the specific private sale is in the public interest must suffice. Congress could, and in my opinion did, vest the Commander-in-Chief with this power free from any judicial control. Because he must state his reasons, a failure to state any reason would render the order invalid; but the reasons stated by him are beyond judicial investigation. Therefore difficult as it may be to appreciate why a private sale to Kropff was in the public interest, the fact that the President stated that it was so must suffice. If then a private sale to Kropff was in the public interest, the reasons given, therefore, "to more effectually secure to and vest title in Kropff," must likewise suffice even though they are not detailed or apparent as are those stated for the sales to the Chemical Foundation in 272 U. S. 1, 8, 16, 17, 47 S. Ct. 1, 71 L. Ed. 131.

Whatever doubts I might have as to the correctness of these conclusions in the light of the legislative history of the act (see 56 Congressional Record, 3944, 4083) are resolved by the opinion in U. S. v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131, and the broad interpretation therein given as to the powers vested in the President.

(b) If the partnership had terminated otherwise than by the declaration of war, Muelhens, as the owner of the American trade-mark and the secret recipe, could clearly have continued the business. He likewise could have assigned the trade-mark and the good will of a United States business in "4711" products. Clearly, too, by agreement he could have retained the secret recipe and even the right not to sell his own products to the assignee, leaving it to the latter to secure them where and how he might find it possible

to do so. If, because of his entirely legal refusal to disclose the secret or to sell goods to the assignee, the latter was unable actually to do business and thus to utilize the trade-mark, such inability would not evidence an intention to abandon the trade-mark or permit Muelhens himself to use it. Cf. Baglin v. Cusenier, 221 U. S. 580, 597, 31 S. Ct. 669, 55 L. Ed. 863. As Justice Holmes says in Beech-Nut Packing Co. v. P. Lorillard Co., 273 U. S. 629, 632, 47 S. Ct. 481, 482, 71 L. Ed. 810, in reference to a trade-mark for goods not made under a secret formula, "The fact that the good will once associated with it has vanished does not end at once the preferential right of the proprietor to try it again upon goods of the same class with improvements that renew the proprietor's hopes."

 In my judgment the Custodian's seizure and conveyance of the trade-mark without the secret recipe gave Kropff and, through him, plaintiff, no lesser rights than such an assignee from Muelhens would have had. The conveyance to Kropff was not of the trade-mark in gross, but as appurtenant to the potential good will of the business that Muelhens, but for the seizure and, during the war, his alien status, could have carried on. True, as I held on the preliminary hearing, Muelhens is not estopped by such a conveyance from asserting any rights that he might have; there is no obligation on him to reveal the secret to Kropff, just as in the case above put there might be no obligation to reveal it to an assignee. But the Custodian's seizure and conveyance did deprive Muelhens of his then rights in and to the United States trade-mark and good will to which it was appurtenant and did give them to Kropff for whatever they might be worth in his hands.

 5. We come therefore to a consideration of the nature and extent of the rights of an assignee of the United States trade-mark and potential good will who has neither a knowledge of the secret formula nor any legal claim against the possessor of it to obtain disclosure thereof. Whatever rights Muelhens himself theretofore had to develop that good will attached to the trade-mark and so passed to Kropff and plaintiff. The Coca-Cola Bottling Co. v. The Coca-Cola Co. (D. C.) 269 F. 796. If there had been no sale, and if after the war Muelhens had obtained a release from the Custodian and then carried on the business of manufacturing and selling cologne products in the United States under the "4711" trade-mark, he might have been faced with a situation in which it was eco-

nomically impracticable, because of tariff or otherwise, to import the prepared essences from Germany. In such circumstances, could not Muelhens have varied the recipe to accommodate it to the kinds of essential oils procurable in this country at least if the product were as nearly similar in quality to the original as plaintiff's product, without impairment of the trade-mark at common law or liability for fraud, deceit, or unfair dealing under the Federal Trade Commission or other legislation?

Actually, both the cologne sold by defendant and that manufactured by plaintiff contain, in the finished product, a denaturant which the liquor prohibition regulations require the parties to use. Moreover, the record shows that a number of French oils were used by Muelhens in the original recipe; whether or not during the war Muelhens in Germany was able to obtain such French oils does not appear in the record, and it was no part of defendant's case to furnish evidence thereon. The court, therefore, is in no position to say that Muelhens adapted his recipe so as to utilize other than French oil. It does appear, however, that during the war and for a short time thereafter plaintiff found it necessary to replace French oils with those from South America.

█ While I am entirely clear, and so held on the preliminary hearing, that under such circumstances the claim could not be made and advertised that the original recipe was used (see Preservaline Manufacturing Co. v. Heller Chemical Co. (C. C.) 118 F. 103; Independent Baking Powder Co. v. Boorman (C. C.) 175 F. 448), I am equally clear that the modern concept of a trade-mark is not so rigid as to forbid slight variations necessitated by trade discoveries, newer and more economical methods of making the same product, or changed manufacturing conditions, even in a secret formula to which the trade-mark is appurtenant. A consideration of the continual changes, advertised and not advertised, which are made in familiar trademarked products, clearly indicates that any other principle would hinder rather than protect manufacturing proprietors of trademarked goods and make exceedingly tenuous the protection which the law affords the mark symbolizing an established and/or potential good will.

█ Of course, a variation in formula resulting in a highly inferior or wholly different product which is palmed off on the public in place of that upon which the good will has been established would not justify the continued protection of the trade-mark. Independent Baking Powder Co. v. Boorman, supra. Indeed, in such cases, if private individuals fail to act, the Federal Trade Commission will take steps to prevent such deception. See Royal Baking Powder Co. v. Federal Trade Commission, 281 F. 744 (C. C. A. 2d). Cf. Federal Trade Commission v. Bradley, 31 F.(2d) 569 (C. C. A. 2d).

Defendant contends that plaintiff's product differs so materially from that formerly sold by Muelhens or by Muelhens & Kropff as licensee of the United States trade-mark, as to compel a court of equity to refuse protection on the ground that the public is deceived. As was said in Coca-Cola Co. v. Koke Co., 254 U. S. 143, 144, 41 S. Ct. 113, 65 L. Ed. 189, such a defense is to be carefully scrutinized; I cannot agree that it has been established. While identity or nonidentity of recipes for a perfume composed of very delicate and chemically complicated natural oils cannot be established by chemical analysis alone, very great similarity has been thereby demonstrated. No expert perfumers have testified in contradiction thereto. While I cannot accept the statements of Kropff, the only practical perfumer who testified, that the two colognes are identical, his testimony does support the chemist's as to the close similarity of the two products. While there is evidence that cheaper and perhaps two different oils are being used by plaintiff, in my judgment its product is not so different as to bring it within the policy of the cases, mainly dealing with action by the Federal Trade Commission, which defendant has cited. Plaintiff undoubtedly has a large part of the secret; its product clearly is not wholly inferior, and while the buying public may well have been deceived by the advertising prior to September, 1927, and thus led to identify the two goods, nevertheless their verdict confirms the substantial similarity.

█ Since I am entirely clear that Muelhens, continuing the business here, but compelled, as in the suppositious cases by tariff or other considerations, to change the formula to the extent that the plaintiff has done, would be protected in the use of the trademark on products made under the changed formula at least so long as he made no false claims of identity with the original formula, it follows that plaintiff should likewise be protected unless its former but discontinued deceptive advertising that it possessed the original recipe bars relief.

6. After the denial of the preliminary injunction on the ground that plaintiff, by advertising that its product was manufactured in accordance with the secret recipe, was asserting what I held and hold to be a false claim, plaintiff modified its advertising and ceased making this assertion. In addition, it sent letters to its wholesale customers in which it withdrew the statement and inclosed a copy of my opinion.

Defendant contends that plaintiff cannot obtain equitable relief (assuming it to be otherwise entitled thereto) by abandoning the objectionable practices after its bill has been filed or after the denial of the preliminary injunction. Three cases have been cited in support of this proposition. In two of them, Alaska Packers' Ass'n v. Alaska Imp. Co. (C. C.) 60 F. 103, and Vick Chemical Co. v. Vick Medicine Co. (C. C. A.) 11 F.(2d) 33, the question was whether or not an interlocutory injunction should be denied, notwithstanding a change in the advertising after the bill had been filed. Evidently the short period since the change caused the court to exercise its discretionary power against the plaintiff. The third case cited is Diamond Crystal Salt Co. v. Worcester Salt Co., 221 F. 66, 67 (C. C. A. 2d). I have examined the record on appeal and Judge Learned Hand's very careful opinion, not reported, but referred to in the C. C. A. opinion. In that case, no preliminary injunction was sought: No attempt was made after the bill was filed to change the false advertising that was held in both courts to bar relief. In both courts, however, the bill was dismissed without prejudice to plaintiff's right to file a new bill "if it shall have shown that all untruthful advertising * * * has been abandoned." Judge Hand expressly refused to designate the time within which a new suit could be brought after the false advertising had been discontinued. In that case the wrongful practices had evidently continued down to the time of the decree. In Gaines v. Turner-Looker Co., 204 F. 553, 559 (C. C. A. 6), the court says, "We are not satisfied that complainant had discontinued all the misleading representations." But the affirmance was without prejudice to the institution of a new suit "whenever complainant shall have put an end to the misleading misrepresentations."

In Moxie Nerve Food Co. v. Modox Co. (C. C.) 153 F. 487, affirmed 162 F. 649 (C. C. A. 1), an injunction was granted in a new suit filed 30 days after the dismissal of the earlier suit and 15 months after the discontinuance of the old advertising. It would seem from the opinion in 152 F. 493 that the advertising changes, though made after the first bill was filed, were not brought to the attention of the trial court before the final decree.

Although plaintiff still maintains that it has the original recipe and that its product is made in accordance therewith, it accepted at least for the time being my contrary preliminary finding, and it is to be assumed that unless and until reversed, it will continue to accept the finding here announced. On this assumption, I am clear that in the light of the cases cited, it could now maintain a suit identical with the present one. In these circumstances, I am of the opinion that the Diamond Crystal Salt Co. Case, supra, does not compel a dismissal without prejudice; on the contrary, inasmuch as in the instant case, unlike the Salt Co. Case, the false statements have been publicly withdrawn not merely before, but practically two years before, the final decree will have been entered, a dismissal without prejudice of the present suit would be a useless formality, inasmuch as an injunction would follow as a matter of course in an immediate new suit.

While abandonment of the false claim that it had the secret recipe is sufficient to enable plaintiff to meet the defense of unclean hands, I have reached the conclusion on further hearing, after having advised the parties that an injunction would be granted, that full protection of the public in the circumstances of this case requires that the granting of such relief be conditioned on further measures to correct the impression created by the former false advertisements. The statements therein, and in plaintiff's former circulars which accompanied its "4711" goods, that they were manufactured in accordance with the old secret recipe, were intended to, and doubtless did, impress the public with the absolute identity of plaintiff's war and postwar "4711" products and the predecessor firm's prewar goods. Such an impression is not fully eradicated merely by refraining from further like assertions, especially when, as here, the most recent advertisements, admitted in evidence on such further hearing, are at least vague in their statements concerning this matter.

In some cases, the continued use of the characteristic label has been held to be an implied representation that the quality or place of manufacture of the product has not been changed and that statements made in the advertising upon which the good will was

built are still true. Prince Manufacturing Co. v. Prince's Metallic Paint Co., 135 N. Y. 24, 31 N. E. 900, 17 L. R. A. 129. See also Prince's Metallic Paint Co. v. Prince Manufacturing Co., 57 F. 938 (C. C. A. 3d); American Cereal Co. v. Eli Pettijohn Cereal Co. (C. C.) 72 F. 903, 907, affirmed 76 F. 372, (C. C. A. 7th); Milbrae Co. v. Taylor, 4 Cal. Unrep. 714, 37 P. 235, 25 L. R. A. 193. While, for reasons hereinbefore stated, I hold that the owner of a trade-mark should not be thus restricted in the development and conduct of his business, I am clear that, in the circumstances of the instant case, the continued use of the trade-mark by the plaintiff should be conditioned on further precautions to protect the public. Its letters to its wholesale customers and its present offer, made since the further hearing, to include with its product a circular containing a clause retracting the false assertion, are insufficient. The circular may or may not be given by the retailer to the customer; moreover, the sale is usually made before the literature accompanying the product is examined. Labels, on the other hand, necessarily may be seen by the customer; they are on the product or its container.

In somewhat analogous cases involving unfair competition, the consumer is often protected by requiring statements on the product that clearly and unmistakably distinguish it from another's goods. See Chickering v. Chickering & Sons (C. C. A.) 120 F. 69, Id. (C. C.) 198 F. 958, modified (C. C. A.) 215 F. 490; Standard Paint Co. v. Rubberoid Roofing Co. (C. C. A.) 224 F. 695, and cases cited. Similarly, in the case at bar, relief should be conditioned upon plaintiff stating on its labels in substance that the product is not manufactured in accordance with the original secret recipe owned by the House of Muelhens. This statement is to be clearly printed in a size and style to be approved by this court and embodied in the decree.

Inasmuch, however, as the purpose of the statement is to correct the impression created by a false assertion made for ten years, 1917 to 1927, I am of the opinion that it need not be continued beyond the year 1937. Compare the decree in McIlhenny Company v. Bulliard (D. C.) 33 F.(2d) 978, 981.

Defendant's request that as a further condition plaintiff be required to change its corporate name so as to exclude the name "Mulhens" would also be granted if it were discretionary in the court so to act. But in my judgment plaintiff has acquired the legal right to the old firm name and has been guilty of no wrong in using it. As was pointed out by Judge Cardozo, in Matter of Brown, 242 N. Y. 1, 6, 150 N. E. 581, 44 A. L. R. 510, where a firm name has not acquired a secondary meaning apart from the individual names therein contained and thus become an arbitrary symbol, the question whether or not, as part of the good will, it can be assigned as an asset on liquidation depends upon the express or implied contract of the partners. Passing by but not deciding whether three decades of use gave to the firm name of Muelhens & Kropff a secondary meaning, and considering the defendant's request in its strongest light, I find that in the instant case, the partnership agreement of 1889, which superseded the agreements of 1881 and 1883, expressly provides:

"In every case of the dissolution of the company, without exception, Mr. Ferdinand Muelhens and his heirs and legal successors have the right to take over the business, with its assets and liabilities and with the firm name. * * *"

Under these provisions, Ferdinand Muelhens or his heirs had the right on dissolution to use the firm name or to assign it as part of the good will. William Kropff therefore would ordinarily have been unable to prevent the continued use of his own name as part of the assigned firm name. Inasmuch as the declaration of war effected a dissolution of the firm (Sutherland v. Mayer, supra), the right to use or assign the firm name passed to Ferdinand Muelhens. Since this was a right to use in the United States the firm name of a partnership formerly doing business therein, it was, unlike the secret recipe, subject to seizure in the United States by the Alien Property Custodian. In my judgment, any one of the three demands made by the Alien Property Custodian sufficed to effectuate the seizure. The conveyance of February 3, 1920, as well as the confirmatory conveyance of August 29, 1923, from the Custodian to William Kropff included "the business and good will of the said firm of Mulhens & Kropff," and, as part of that good will, vested in Kropff and, through him, in plaintiff, the right to use the firm name. See Koppel Industrial Car & Equipment Co. v. Orenstein & Koppel Aktiengesellschaft, 289 F. 446 (C. C. A. 2d); Id. (D. C.) 12 F.(2d) 1009. Equity can mold its decrees to effectuate justice; an injunction, subject to the condition stated, without accounting and without costs will in my judgment be the proper relief in the circumstances.

There is no prayer in the bill for general relief; the specific relief will be granted in part as prayed for, that defendant be enjoined from selling eau de cologne and/or other articles bearing the said trade-mark "4711" and from publishing statements to the effect that it (the defendant) is selling the only "genuine 4711" eau de cologne and/or other goods and that plaintiff's eau de cologne is not "genuine 4711" eau de cologne. As to the final clause of the prayer, however, asking that defendant be further enjoined "from otherwise directly or indirectly interfering with the sale of plaintiff's *4711* eau de cologne and other toilet articles," limiting clauses must be added thereto. Certain interferences are clearly permissible. Prestonettes, Inc., v. Coty, 264 U. S. 359, 44 S. Ct. 350, 68 L. Ed. 731. Neither Muelhens nor defendant is in fact assignor of any rights that plaintiff has acquired. So far as they are concerned, the acquisition was in invitum. As heretofore stated, no element of estoppel prevents them from exercising any and all rights that they may have. They may sell their products freely in this country; they may designate them by whatsoever name they please in so far as such name would not infringe upon "4711"; they may assert their ownership in all other countries and the identity of their product with that so sold before the war in this country as "4711," as well as Muelhens' sole ownership and knowledge of the old secret recipe under which the product is made. See Lecouturier v. Rey, supra [1910] A. C. at page 272, citing French decisions. This enumeration is not intended to be exhaustive but only illustrative. See, too, Coca-Cola Co. v. Old Dominion Beverage Corp., 271 F. 600, 603 (C. C. A. 4th): "It [defendant] may tell the thirsty that its drink is not only as good as Coca-Cola, but that it believes it to be in fact the same thing. * * * "

 The result may be commercial warfare. I personally deeply regret that the attempts of the parties during the trial and prior to the filing of this opinion to effect a settlement proved abortive. The fact that the plaintiff consented to these attempts during the trial confirmed my own belief in the worthlessness of any verbal promise to the Custodian that the business would in the future be kept free from those who were then alien enemies. If in fact such a promise was exacted, it was without binding effect; no such arbitrary power was vested in the Custodian. In any event, Kropff was in no wise thereby prevented from seeking release therefrom after the termination of the war. While, as I have held, his fiduciary relation did not prevent him from acquiring his copartner's interest, no obligation of patriotism stood in the way of his recognition, after the war, of his moral obligations to the House of Muelhens. These in my judgment he not only failed to observe, but deliberately and deceitfully transgressed in his claim to knowledge of the secret recipe; for I do not credit the statement that if in fact he did not have such knowledge he nevertheless believed that he had it. In these circumstances, a court of equity, while according to him its protection and its assistance in so far as the developed law requires, will not be astute to stretch that development in his favor; on the contrary, it will aim to confine him and those claiming through him to the strict limits of their legal rights. Naturally the determination of any such rights in this case as against the defendant herein is entirely without prejudice to the attack thereon by the Custodian in an independent suit pending in this court. Decree may be submitted on two days' notice.