**BAMBU SALES, INC., Plaintiff,**

v.

**SULTANA CRACKERS, INC., Bernard Gold and Brian Gold, Defendants and Third Party Plaintiffs,**

v.

**NU SERVICE TOBACCO CO. INC., Third Party Defendants.**

**BAMBU SALES, INC., Plaintiff,**

v.

**GULACK TRADING CO., INC.; Bernard Gulack; NU Service Tobacco Co., Inc., and William Brooks, Defendants.**

Nos. 86 CV 1928, 86 CV 2045.

United States District Court,
E.D. New York.

March 14, 1988.

Milton Springut, Amster, Rothstein & Ebenstein, New York City, for plaintiff.

Gardin, Schotsky & Rappaport, P.C., Melville, N.Y. (Arnold Lesser, New York City, of counsel) for Sultana Crackers and Brian Gold.

Herman R. Perper, Spring Valley, N.Y., for Gulack Trading Co. and Bernard Gulack.

John A. Mitchell, Mitchell & Incantalupo, Forest Hills, N.Y., for defendants and third party defendants Nu Service Tobacco Co., Inc., and William Brooks.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

On January 4, 1988, the Court received the annexed amended Report and Recommendation ("Report") of the Honorable Allyne R. Ross, United States Magistrate. None of the parties to the motions have filed written objections pursuant to 28 U.S. C. § 636(b)(1); Local R.Mag.P. 7. After a *de novo* review, I hereby adopt the Report as the opinion of this Court.

SO ORDERED..

1. As is evident from the caption, plaintiff in fact filed two lawsuits, one against Sultana and its principals, CV 86–1928 (JMM), and the other against Gulack and Nu Service and their princi-

## RECOMMENDATION AND REPORT

ALLYNE R. ROSS, United States Magistrate:

Plaintiff, Bambu Sales, Inc. ("Bambu"), the registered owner of United States trademark rights for the use of the name BAMBU in connection with cigarette paper, brings suit for trademark infringement and unfair competition against Sultana Crackers, Inc. ("Sultana"), Nu Service Tobacco Co., Inc. ("Nu Service") and Gulack Trading Co., Inc. ("Gulack") and certain of their principals. The suit alleges unauthorized distribution in the United States of Bambu cigarette paper in packaging bearing counterfeit BAMBU marks.[1] The case has been referred to the undersigned for recommendation and report on the parties' cross-motions for summary judgment and for other relief.

## THE FACTS

### A. *Plaintiff's Acquisition of the BAMBU Mark*

Sometime prior to 1907, plaintiff's predecessor, Papeleras Reunidas, S.A. ("Papeleras"), a Spanish manufacturer and distributor of cigarette paper, adopted and registered the BAMBU mark on and in connection with cigarette paper in the United States Patent and Trademark Office. In approximately 1976, plaintiff Bambu was designated the exclusive United States distributor of paper sold under the BAMBU mark. Since that time, as part of its sales and distribution activities, plaintiff has extensively promoted its product, advertising the BAMBU mark throughout this country in newspapers, magazines, and trade publications.

In October of 1984, following the insolvency of Papeleras, its liquidators assigned to plaintiff, for stated consideration, all of the Spanish company's "right, title and interest in the United States" to the BAMBU mark "together with the goodwill of the business symbolized thereby." (Agree-

pals, CV 86–2045 (JMM). However, since the motions at issue here have, for all practical purposes, benn consolidated, the suits will be referred to below as a single unified proceeding.

ment of October 9, 1984, as amended by Agreement of October 15, 1984). From the date of that assignment to the present, plaintiff has continued its business of selling and distributing BAMBU cigarette paper in the United States. Its sales have risen annually, to a volume of 22 million booklets in its 1986 fiscal year.

## B. Defendants' Activities

In mid–1986, Rodesol International ("Rodesol"), a domestic jobber, distributed to wholesalers in the United States cigarette paper bearing the BAMBU mark packaged in booklets and boxes displaying counterfeits of the BAMBU mark. These sales were not authorized by plaintiff Bambu.[2] During May and June of 1986, each of the corporate defendants in this action—Sultana, Nu Service and Gulack—purchased, directly or indirectly, Rodesol's unauthorized merchandise, and resold some quantity of that product, again in sales which Bambu had not authorized.

## C. The Complaints

In June of 1986, Bambu filed suit against the corporate defendants and certain of their principals alleging that the above-described acts constituted willful infringement of plaintiff's registered trademarks, in violation of Section 32(1) of the Lanham Trademark Act (the "Act"), 15 U.S.C. § 1114(1) (Count I); the use in commerce of false designations of origin and false descriptions and representations, in violation of plaintiff's rights under Section 43(a) of the Act, 15 U.S.C. § 1125(a) (Count II); and unfair competition under the common law (Count III). Plaintiff seeks declaratory and injunctive relief barring defendants' unauthorized use of the BAMBU mark, as well as damages, an accounting for profits realized as a result of the alleged infringement, costs and attorneys fees.

## D. The Instant Motions

Plaintiff has moved for summary judgment on the issue of liability on each of its three claims against the corporate defendants and individual defendants William Brooks, the president of Nu Service, Brian Gold, Sultana's sales manager, and Bernard Gulack, the manager of Gulack Trading.[3] Individual defendants Bernard Gold, president of Sultana, William Brooks and Bernard Gulack have, in turn, cross-moved for summary judgment dismissing the complaint as to them. Additionally, the Sultana defendants (Sultana and Brian and Bernard Gold) seek an order disqualifying plaintiff's counsel from representing plaintiff at any trial in this lawsuit, and defendants Nu Service and Brooks move to implead Rodesol as a defendant in this action.

In opposing plaintiff's summary judgment motion, defendants do not appear to contest any of the facts recited above. That is, they acknowledge their purchase and resale of the Rodesol merchandise; they do not dispute that its packaging bore unauthorized copies of the BAMBU mark; they themselves assert a high degree of similarity between the unauthorized marks and plaintiff's genuine BAMBU mark; and they assume that their sales were not in any way authorized by plaintiff.

Rather, in urging the existence of genuine issues of material fact precluding summary judgment, defendants jointly advance four arguments: First, they attack the validity of plaintiff's trademark, claiming that the assignment by which plaintiff purports to have acquired rights in the mark was an invalid assignment in gross (i.e., an assignment not accompanied by a transfer of good will), in violation of § 10 of the Lanham Act, 15 U.S.C. § 1060. Second, they contend that a 1984 order of the United

---

**2.** On January 13, 1987, a Final Judgment Upon Consent was entered in *Bambu Sales, Inc. v. Rodesol, et al.,* CV 86 2211 (JMM), in which Rodesol and its principals acknowledged, *inter alia,* infringement of plaintiff's rights by distribution and sale of unauthorized products bearing the BAMBU trademark.

**3.** With respect to the final individual defendant—Bernard Gold, president of Sultana—plaintiff does not seek summary judgment.

In requesting summary judgment on the issues of liability only, plaintiff suggests that issues concerning the relief sought in the action, including the grant of an injunction and the assessment of monetary damages, be deferred to a later stage in the proceeding.

States District Court for the Northern District of Illinois placing a lien on the trademark registration of plaintiff's predecessor, Papeleras Reunidas, casts a "cloud on plaintiff's title" to the mark, requiring further discovery. Third, they claim that their sales of paper bearing the BAMBU mark could not violate plaintiff's rights because, they assert, the paper itself was "not counterfeit." And fourth, they urge that plaintiff's failure to display on its product the statutory notice required by § 29 of the Lanham Act, 15 U.S.C. § 1111, bars each cause of action absent proof that defendants received actual notice of plaintiff's registration of the mark, a triable issue of fact. In addition to the above arguments that are jointly advanced by all defendants, Nu Service asserts that its December 1986 filing for Chapter 11 bankruptcy proceedings automatically stays this lawsuit as to it, presumably precluding the relief plaintiff seeks on this motion. Each of these arguments and each of defendants' additional motions will be addressed below.

## DISCUSSION

### A. *The Summary Judgment Motions*

#### 1. *The Governing Principles*

Rule 56(c), Fed.R.Civ.P., provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering the motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

To defeat a summary judgment motion, however, assertedly unresolved factual issues must be material to the outcome of the litigation. "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice...." *Quarles v. General*

*Motors Corp.,* 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Further, where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

As recently reformulated by the Supreme Court, the inquiry under the summary judgment standard is identical to that under the "reasonable jury" directed verdict standard. One asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 106 S.Ct. at 2512. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for the jury to return a verdict for that party." *Id.* at 2511. The application of these principles to the facts of this case is examined below.

#### 2. *Plaintiff's Motion for Summary Judgment Against the Corporate Defendants*

#### a. *The Validity of the Assignment of the BAMBU Mark*

In opposition to plaintiff's summary judgment motion, the primary defense interposed is an attack upon plaintiff's ownership rights in the BAMBU registration and trademarks. Specifically, defendants contend that the 1985 assignment of the BAMBU registration and marks from Papeleras to plaintiff is invalid as a "naked assignment in gross" since, defendants claim, no good will was acquired by plaintiff in conjunction with the marks.

In urging that there exist sufficient grounds to raise a genuine issue as to the validity of that assignment, defendants

point to the following three factual matters: First, they recite that plaintiff purchased the marks from the liquidation committee of an insolvent assignor, Papeleras, and that the assignment was not accompanied by any transfer of physical assets. Second, they note with respect to the "Assignment of Trademark" from Papeleras to plaintiff dated October 9, 1984, that the final "whereas" clause authorizes the sale of the BAMBU marks without reference to an assignment of the assignor's good will. Finally, they have belatedly submitted two affidavits of Jose Gonzalez, previously a Papeleras employee, who asserts that, for stated reasons, the quality of cigarette paper sold by Bambu since the assignment is inferior to that which Papeleras sold before the assignment. As indicated below, however, none of these matters, individually or in combination, is sufficient as a matter of law to raise a genuine issue of material fact regarding the validity of the assignment requiring resolution by trial.

It is a central tenant of trademark law that "[a] trade name or mark is merely a symbol of good will; it has no independent significance apart from the good will it symbolizes." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir.1984). As the Supreme Court has explained:

> The asserted doctrine is based upon the fundamental error of supposing that a trademark right is a right in gross or at large ... There is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.... [T]he right to a particular mark grows out of its use, not merely its adoption, its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918).

Because good will and its symbol, the trademark, are inseparable, the mark may be transferred only in conjunction with the good will that it symbolizes. *Lanham Act* § 10, 15 U.S.C. § 1060. Hence, a sale of a mark divorced from its good will, which is characterized as an "assignment-in-gross," is a nullity; and the assignee can place no reliance upon it in enforcing rights to the mark against others. *Defiance Button Machine Co. v. C & C Metal Products*, 759 F.2d 1053, 1059 (2d Cir.1985); *Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 (C.C.P.A.1978).

That the assignment of a trademark must be accompanied by the good will it symbolizes does not, however, bar transfer of the mark independently of the underlying business. It is settled that a trademark may be validly transferred without the simultaneous transfer of any tangible assets. *See, e.g., Defiance Button Machine Co. v. C & C Metal Products*, 759 F.2d at 1059–1062, and cases cited therein; *Glamorene Products Corp. v. Procter & Gamble Co.*, 538 F.2d 894 (C.C.P.A.1976); *Hy–Cross Hatchery, Inc. v. Osborne*, 303 F.2d 947 (C.C.P.A.1962); and J. McCarthy, *Trademarks and Unfair Competition*, (2d ed. 1984), § 18:7 at 814 ("the clear trend is that a transfer of tangible or physical assets is not crucial.") Likewise, a company's cessation of business does not automatically terminate its rights to a mark, *Defiance Button Machine Co. v. C & C Metal Products*, 759 F.2d at 1062–62, and a trademark of an insolvent corporation is saleable in bankruptcy independently of the bankrupt's other assets, *Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 441 F.2d 675, 680 (C.C.P.A.1971); *Beech–Nut Packing Co. v. P. Lorillard Co.*, 299 F. 834 (D.C.N.J.1924), *aff'd.*, 7 F.2d 967 (3d Cir. 1925), *aff'd*, 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810 (1927). This is so, of course, as long as good will passes with the mark.

As formulated by the Second Circuit, there appear to be two tests for determining whether the transfer of a mark apart from the underlying business involves the passing of good will. First, the good will of a company is viewed as making such a transition if "the purchaser [is] able to 'go on in real continuity with [the] past.'" *Defiance Button Machine Co. v. C & C Metal*

*Products,* 759 F.2d at 1060 (quoting *Mutual Life Ins. Co. v. Menin,* 115 F.2d 975 (2d Cir.1940)). *See also Marshak v. Green,* 746 F.2d at 930 ("Courts have ... upheld such assignments if there is a continuity of management," citing *Marshak v. Green,* 505 F.Supp. 1054 (S.D.N.Y.1981) (Weinfeld, J.)); and J. McCarthy, *Trademarks and Unfair Competition,* § 18:1 at 794 ("The law's requirement that good will always go with the trademark is a way of insuring that the assignee's use of the mark ... will not break the continuity of the thing symbolized by the assigned mark."). Alternatively, assignments of marks separate from the underlying business have been upheld when "the assignee is producing a product or performing a service substantially similar to that of the assignor [such that] consumers would not be deceived or harmed." *Marshak v. Green,* 746 F.2d at 930 (citations omitted). *See also Defiance Button Machine Co v. C & C Metal Products,* 759 F.2d at 1060 ("As long as ... the [new] owner intends to use [the mark] in connection with substantially the same business or service, the public is not deceived.").

■ Applying those tests to the undisputed facts of this case, it is difficult to discern even a colorable issue as to whether good will passed with the BAMBU mark. Papeleras Reunidas, plaintiff's predecessor, owned and continuously used the BAMBU mark for approximately 80 years preceding the assignment and, during that period, the mark became widely known and developed substantial good will. For almost a decade of that time, plaintiff was the exclusive distributor in the United States of paper bearing the BAMBU mark and plaintiff widely advertised its product, both to the trade and to the consuming public. Thus, to the extent that good will is a product and symbol of those customer relationships developed through investment in advertising, *see* J. McCarthy, *Trademarks and Unfair Competition,* § 2:10 at 84–87, plaintiff was, in effect, the exclusive repository in the United States of this aspect of BAMBU's good will for a decade prior to the assignment.

In October of 1984, at a time when Papeleras was in liquidation, its liquidators executed an assignment purporting to transfer the BAMBU mark to plaintiff. While defendants are correct that the final "whereas" clause of the original agreement dated October 9, 1984 omitted any reference to the good will of the business, the amended assignment agreement, dated October 15, 1985, expressly recites the assignment of good will.

Finally, following the assignment, plaintiff maintained the identical business it had previously engaged in for an eight year period—that is, sales of cigarette paper under the BAMBU mark. Indeed, plaintiff's sales of BAMBU paper have continued to expand since the assignment, growing to some 22 million booklets in its 1986 fiscal year.

In short, measured either by the test of "continuity" or by that of "substantially the same business or product," the facts here compel the conclusion that good will passed with the BAMBU mark. *See, e.g., Glamorene Products Corp. v. Procter & Gamble Co.,* 538 F.2d 894 (assignment of trademark held effective absent the transfer of any tangible assets where agreement expressly stated assignment of good will, substantial good will was associated with assignor's mark as a dry cleaning detergent prior to the assignment, and the assignee had been actively working on its own dry cleaning detergent and used the mark in connection with that product). Moreover, contrary to defendants' contentions, as a matter of law that conclusion cannot be impeached by either the language of the assignment or plaintiff's failure to acquire the assets of its predecessor's business.

As noted above, the third factual issue defendants seek to raise in attacking the validity of the assignment concerns the quality of the BAMBU paper sold before and after that event. Specifically, Jose Gonzalez, "an engineer working in Spain for cigarette paper manufacturers" and previously an employee of Papeleras (Gonzalez Affidavit of May 2, 1987), opines in a Supplemental Affidavit dated September

30, 1987 that plaintiff's paper is "of a quality inferior to that of the standard quality" previously sold by Papeleras, in that plaintiff's paper "is thinner ... and as a result it is more difficult to roll a cigarette with the thinner paper ... which is more difficult to handle and curl in the desired manner." (¶¶ 2–3).[4] The question thus becomes whether this affidavit, impugning the quality of plaintiff's paper based on its thickness, raises a genuine issue of material fact warranting a trial regarding the validity of the assignment.

It is true that a substantial change in the goods sold under a mark may so alter the nature of the good will symbolized that use of the mark is tantamount to a fraud on consumers and the original right to the mark is abandoned or lost. *See* J. McCarthy, *Trademarks and Unfair Competition* §§ 17:9 and 18:8 at 783–85 and 815–16. This principle has been expressed by the Second Circuit as follows:

> Use of the mark by the assignee in connection with a *different goodwill* and *different product* would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another.

*Marshak v. Green*, 746 F.2d at 929 (emphasis added). *See also Pepsico, Inc. v. Grapette Co.*, 416 F.2d 285 (8th Cir.1969) and *Mulhens & Kropff, Inc. v. Ferd Muelhens, Inc.*, 38 F.2d 287 (D.C.N.Y.1929), *rev'd.*, 43 F.2d 937 (2d Cir.), *cert. denied*, 282 U.S. 881, 51 S.Ct. 84, 75 L.Ed. 777 (1930). In fact, this principle obtains whenever there is a drastic alteration in the goods sold under a mark, whether or not that change occurred in conjunction with an assignment. In both contexts, the test is apparently the same—whether the new product is so different from the old that to allow continued use of the mark would "work a deception upon the public". 3 R. Callmann,

*The Law of Unfair Competition Trademarks and Monopolies*, § 19.40 at 176.

The caselaw is uniform that the discontinuity in product that works a forfeiture or abandonment of a trademark is an extreme one. In the leading case of *Pepsico, Inc. v. Grapette Co.*, 416 F.2d 285, the Eighth Circuit held invalid the assignment of a mark long associated and used in connection with a cola syrup when the assignee applied it to a "pepper" type beverage. In so doing, the Court reasoned:

> Where a transferred trademark is to be used on a new and different product any goodwill which the mark itself might represent cannot legally be assigned. "The trademark owner does not have the right to a particular word but to the word as the symbol of particular goods." Callmann, § 78.1(a) at 426. To hold otherwise would be to condone public deceit. The consumer might buy a product thinking it to be of one quality or having certain characteristics and could find it only too late to be another.

*Id.* at 289.

Similarly, in *Mulhens & Kropff v. Ferd Muelhens, Inc.* 38 F.2d 287, 293, the trademark purportedly assigned indicated a cologne manufactured in accordance with a secret formula, yet the assignment agreement explicitly reserved knowledge of the formula to the assignor. There, the Court acknowledged that some variation in the product sold under a mark is inevitable, and is often "necessitated by trade discoveries, newer and more economical methods of making the same product, or changed manufacturing conditions ..." *Id.* at 295. Further, as the Court noted:

> A consideration of the continual changes, advertised and not advertised, which are made in familiar trademarked products, clearly indicates that any other principle would hinder rather than protect manufacturing proprietors of trademarked goods and make exceedingly ten-

---

**4.** In his Supplemental Affidavit, Gonzalez also relates that "many customers have stated that the cigarette paper now being sold by Bambu Sales, Inc. is difficult to use, and that they much prefer the BAMBU brand paper that was previously sold (by Papeleras Reunidas, S.A.)." (¶ 5).

Since this is clearly a proffer of incompetent hearsay evidence, it will not be considered on this motion. *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919 (2d Cir.1985).

uous the protection which the law affords the mark symbolizing an established and/or potential good will.

*Id.* According to the Court, however, this was to be distinguished from a variation resulting in a "wholly different product which is palmed off on the public in place of that upon which the good will has been established ..." In the Court's view, the latter situation "would not justify continued protection of the trademark." *Id. See also Independent Baking Powder Co. v. Boorman,* 175 F. 448, 455 (C.C.D.N.Y.1910) (trademark rights acquired in connection with alum baking powder could not be transferred to phosphate powder).

The caselaw is also uniform that where the product or service is essentially the same before and after the transfer, variations in type or quality will not invalidate the assignment. Thus, in *Hy–Cross Hatchery, Inc. v. Osborne,* 303 F.2d 947 (1962), the Court of Customs and Patent Appeals upheld the validity of an assignment of a trademark for poultry independent of any other assets of the assignor's business where the mark was transferred to a producer who raised a different variety of chickens. According to the Court, the assignee, like the assignor, "was not under any obligation to the public not to change the breed of chicks he sold under the mark from time to time." *Id.* at 950. Likewise, in *E.I. DuPont de Nemours & Co. v. G.C. Murphy Co.,* 199 U.S.P.Q. 807, 813 (T.T. & A. Bd.1978), the Court held that a change in the quality of a paint from "premium priced" to "budget-type" would not interrupt the continuity of the mark, so long as "[t]he inherent and identifiable character of the goods remains the same." In the Court's view, that test was met by the substantial similarity of the two products' ingredients, use and channels of distribution. *See also, Glamorene Products Corp. v. Procter & Gamble Co.,* 538 F.2d 894 (upholding assignment of mark used on

different dry cleaning detergent); *Beech–Nut Packing Co. v. P. Lorillard Co.,* 299 F. 834, 849 (D.C.N.J.1924) (upholding assignment of mark upon predecessor's liquidation, although assignee applied the mark to tobacco of a different blend and formula); and *White Satin Mills Corporation v. Woodward,* 34 F.2d 158 (D.C.Minn.), *aff'd.,* 42 F.2d 987 (8th Cir.1929) (change in type of sugar sold under the mark did not invalidate assignment).[5]

In assessing the likelihood of consumer deception resulting from the assignment of a mark—which, as noted above, is the test of the validity of the assignment, one commentator draws a distinction based on the nature of the trademarked goods. 3 R. Callmann, *The Law of Unfair Competition Trademarks and Monopolies,* § 19.40 at 176–187. If the goods are unique (for example, made under a patent or secret formula, or by an enterprise of established tradition such as the porcelain manufacturers of Limoges or Copenhagen), "the provenance of the article is a value in and of itself ..."; "... the public wants only the 'genuine' article." Under such circumstances, assignment of the mark without the business it symbolizes creates a high likelihood of consumer deception. *Id.* at 177. With respect to fungibles, however, goods that are "familiar to all and can be produced by many under varying trademarks," "[t]he public is no longer concerned with ... the origin of the article. The article itself is what the buyer wants and will continue to buy so long as it satisfies consumer demand, and until another article, better advertised or more effective, replaces it." *Id.* at 177. Thus,

> ... a trademark relating to fungible goods should be more freely alienable; the owner may relinquish the use of a trademark and, without more, transfer his rights thereunder to an assignee. The latter may then use the trademark as he pleases, but on similar goods only.

---

**5.** The same principles apply with regard to the assignment of service marks. *See, e.g., Visa, U.S.A., Inc. v. Birmingham Trust National Bank,* 696 F.2d 1371, 1376 (Fed.Cir.1982), *cert. denied,* 464 U.S. 826, 104 S.Ct. 98, 78 L.Ed.2d 104 (1983) ("transfers of goodwill [of service mark] re-

quires only that the services be sufficiently similar to prevent customers of the service offered under the mark from being misled from established associations with the mark"); and *The Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666 (7th Cir.1982).

He may legitimately exploit the reputation of the trademark, as did his predecessor, and if his product does not satisfy the public, that will be reflected in his business success. He must decide whether he will preserve or risk the goodwill of the old mark.

But if he applies the trademark to dissimilar goods, he then adopts a "different" trademark.

*Id.* at 187. *Cf., Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir.1977) ("Retention of a trademark requires only minimal quality control, for in this context we do not sit to assess the quality of products sold on the open market.").

■ Measured by these principles, it becomes clear that defendants' attack upon the quality of plaintiff's product in this case—that it is thinner than the cigarette paper of plaintiff's predecessor, rendering it more difficult to roll and curl—is insufficient as a matter of law to invalidate the assignment. Unlike Limoges porcelain and unlike a cologne manufactured under a secret formula, cigarette paper is a fungible commodity. Hence, the transfer of a trademark associated with this product creates no greater likelihood of consumer deception than does the transfer of a mark associated with poultry or paint or tobacco or flour or dry cleaning detergent. Moreover, unlike the assignment in *Pepsico* where the transferee sought to apply the mark to an entirely different type of beverage from that with which its good will had been associated, there is no suggestion here that the fundamental nature of plaintiff's product has been altered since the assignment. It is undisputed that plaintiff still sells cigarette paper and that its product is identifiable as such.

In short, because it is undisputed that "the inherent and identifiable character" of the product associated with the BAMBU mark has not been altered, and in view of the other uncontroverted evidence (reviewed above at 12–14) that good will passed when plaintiff acquired the mark,

defendants' factual assertions regarding the quality of plaintiff's paper cannot, as a matter of law, invalidate the assignment. Under the governing legal principles, no rational juror could conclude that the claimed defects are of sufficient materiality to work a forfeiture or abandonment of the mark.

### b. The Asserted "Cloud" on Plaintiff's Title

■ As a second line of defense against plaintiff's summary judgment motion, defendants have submitted a certified copy of a court order dated October 26, 1984 filed in the United States District Court for the Northern District of Illinois, Eastern Division, in a proceeding entitled *Adams Apple Distributing Co. v. Papeleras Reunidas, S.A.*, No. 77C 868. The order directs that, "pending a final adjudication of this case, until further order of the court", a "judgment lien" be imposed on the trademarks of Papeleras Reunidas registered in the Patent and Trademark Office, including the BAMBU mark, by the filing of a copy of the order with the patent office. Defendants assert, without further explanation, that the lien on the BAMBU mark created by the filing of this order against plaintiff's predecessor casts "a cloud" on plaintiff's title, requiring further discovery on this issue. The ambiguity of the characterization notwithstanding, it is clear that the noted lien is of no avail to defendants in their efforts to block summary judgment in this case.

At the outset, the order prohibiting the Patent and Trademark Office from "recording any assignment, transfer or other disposition" of the BAMBU mark is dated October 26, 1984—some two weeks after plaintiff recorded its acquisition of the mark from Papeleras.[6] Hence, even if the recording of the judgment lien could have effectively barred or burdened any subsequent disposition of the mark, it came too late to affect plaintiff's rights, which were acquired by assignment recorded on October 12, 1984.

---

6. The original assignment, dated October 9, 1984, was recorded on October 12, 1984. The amended assignment, dated October 15, 1984, was apparently not recorded.

Moreover, as the Seventh Circuit made clear in the subsequent appeal from the district court's order, *see Adams Apple Distributing v. Papeleras Reunidas,* 773 F.2d 925 (1985), the judgment lien did not in any way impair or "cloud" Papeleras's title to the BAMBU mark. On appeal, Papeleras had argued that the judgment lien was improper because, *inter alia,* a trademark is not subject to an involuntary judicial sale. In so doing, Papeleras relied on the principle (reviewed above at 9–12) that a trademark is not a property right in gross which may be sold apart from the business or good will with which it has been associated. In rejecting Papeleras's argument, the Seventh Circuit concluded that the judgment lien ordered by the district court in the case before it did not run afoul of that settled doctrine precisely because it did not operate to impair the holder's title to the mark. Specifically, the Court held:

> [U]nder Illinois law an equitable lien is merely a remedy for a debt. It exists wholly independent of the thing to which it is attached and does not dive[s]t the debtor of either title or possession. "An equitable lien is simply a charge on property for the purpose of security." *Chirekos v. Chirekos,* 33 Ill.App.3d 606, 338 N.E.2d 140, 143 (1975) (citation omitted). Therefore, imposing an equitable lien on a trademark does not seek to give the lienholder an in gross property right to the trademark itself. For these reasons, we hold that it is permissible to impose an equitable lien on a business trademark.

*Id.* at 931. In short, whatever the function of the Adams Apple lien, it did not and could not divest Papeleras of title or transfer any property right to the BAMBU mark. Hence, it cannot be relied upon in support of a claim that plaintiff's title to the mark is invalid or impaired.

Far from casting a "cloud" on plaintiff's "title" to the mark, the judgment lien created, at most, certain rights in a third party—Adams Apple—in the collection of its judgment against Papeleras or, perhaps, its successor. Thus, in suggesting that this lien could in some way form the basis of a defense in this action, defendants have, in effect, sought to interpose a third party's rights as a bar to plaintiff's infringement suit against them. This, defendants cannot do.

■ "The defense of *jus tertii* arises when defendant raises the right of a third party." 2 J. McCarthy, *Trademarks and Unfair Competition,* § 31:39 at 671. In the context of a trademark infringement suit, "a claim by defendant that a third party has rights in the mark superior to plaintiff is … a *jus tertii* defense." *Id.* Modern decisions have flatly rejected the defense in trademark litigation, one court remarking that there is a "general prohibition against the assertion of *jus tertii* as a defense …" *Capetola v. Orlando,* 426 F.Supp. 616 (E.D.Pa.1977) (in trademark infringement suit, defendants lacked standing to assert that plaintiff's registration was invalid because its registration application failed to show requisite written consent by individual whose name the mark adopted). *See also Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571 (D.N.J.1985); *Louisiana Pacific Corp., Weather–Seal Div. v. Smith,* 185 U.S.P.Q. 231 (S.D.Ohio 1974); and 2 J. McCarthy, § 1:39 at 674–75 and cases cited therein. As Professor McCarthy has written:

> As a matter of policy, *jus tertii* should not be allowed as a defense in any trademark case. So long as plaintiff proves rights superior to defendant, that is enough. Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world. The plaintiff's speculative dispute with a third party does not concern the defendant.
>
> To permit a *jus tertii* defense would be an unwise judicial policy because it would expand many trademark disputes far beyond a mere two party conflict…. By raising *jus tertii,* a defendant could effectively divert attention from its own alleged infringement and become a vicarious avenger of another's purported rights against itself. A case could be expanded beyond reasonable bounds and effectively slowed to a crawl.

*Id.* at 675. For these reasons, as a matter of law the Adams Apple judgment lien cannot form the basis of a defense in this lawsuit and is no bar to the summary judgment relief plaintiff seeks.

### c. *The Genuineness of the Bambu Paper*

A third issue defendants raise in opposing plaintiff's motion concerns the asserted "genuineness" of the BAMBU paper they distributed. The factual basis for the argument is set forth in the affidavits of defendants Brian Gold, Bernard Gulack and William Brooks. Specifically, each affirms that the cigarette paper his company distributed appears identical to a product manufactured by Papelera Alcoyana, S.A. ("Papelera Alcoyana"), a Spanish company. Additionally, each expresses his "belief" that Papelera Alcoyana in fact manufactured that paper and owns the BAMBU trademark in Spain and elsewhere.[7] Based on this showing, defendants conclude that the BAMBU paper they distributed was "not counterfeit." Further, they apparently take the position that the asserted genuineness of the paper precludes their infringement of plaintiff's rights. Again, as a matter of law, neither conclusion is supportable.

■ At the outset, Rule 56, Fed.R.Civ.P., requires that affidavits supporting or opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." "Hearsay testimony and opinion testimony that would not be admissible if testified to at the trial may not properly be set forth in an affidavit." 6—Pt. 2 *Moore's Federal Practice,* ¶ 56.22[1] and cases cited therein. If such statements are made, they will be disregarded, *id.,* for "belief or opinion alone, no matter how sincere it might be, is not the equivalent of personal knowledge." *Feldman v. Birjer,* 205 F.Supp. 87, 90 (D.Mass.1962).

Here, the affidavits proffered in support of defendants' claim that the paper they sold was "not counterfeit" are wholly deficient and provide no evidence at all of the contention advanced. Defendants' opinion that the paper they sold is "identical" to that manufactured by Papelera Alcoyana is of no weight, since their affidavits set forth no basis upon which to conclude that they are competent to testify on this subject. Similarly, their asserted belief that Papelera Alcoyana manufactured the paper and owns the BAMBU mark in Spain and other countries is concededly based on other than personal knowledge. Lacking any evidentiary support, the contention that the paper was "not counterfeit" must be disregarded.

■ Moreover, even if defendants had proffered a competent evidentiary showing in support of their claim, it provides no legal defense to plaintiff's lawsuit. Since the Supreme Court's opinion in *A. Bourjois & Co. v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), the "territoriality principle," recognizing that a trademark has a separate legal existence in each country, has been an established feature of American trademark law. *See Weil Ceramics & Glass, Inc. v. Dash,* 618 F.Supp. 700, 705 (D.C.N.J.1985); *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163, 1171–1172 (S.D.N.Y.1984). Under that principle, the function of a trademark is not necessarily to specify the "source of origin" of a product,

> but rather to symbolize the domestic goodwill of the domestic markholder so that the consuming public may rely with an expectation of consistency on the mark by its owner, and the owner of the mark may be confident that his goodwill and reputation (the value of the mark) will not be injured through use of the mark by others in domestic commerce.

*Osawa & Co. v. B & H Photo,* 589 F.Supp. at 1172 (citations omitted). *See also Roger & Gallet v. Janmarie, Inc.,* 245 F.2d 505 (C.C.P.A.1957) (trademarks registered in

---

**7.** Each also acknowledges having no knowledge of any relationship between plaintiff and Papelera Alcoyana.

the U.S. have a local identity and situs apart from foreign manufacturer).

In *Bourjois*, a French manufacturer of face powder had sold plaintiff its business and good will in the United States, together with its trademarks, which plaintiffs registered. Plaintiff continued to purchase powder from the French manufacturer and distributed it in the United States in boxes bearing plaintiff's name. When defendant imported and sold the French firm's product in genuine French boxes closely resembling those used by plaintiff, plaintiff sought an injunction, which was granted by the district court. In reinstating that injunction, the Supreme Court held that defendant's distribution of the "genuine" powder infringed plaintiff's exclusive right to use its mark in the United States. The Court explained:

> It is said that the trademark here is that of the French house and truly indicates the origin of the goods. But that is not accurate. It is the trademark of the plaintiff only in the United States and indicates in law, and, it is found, by public understanding, that the goods come from the plaintiff although not made by it.

The holding in *Bourjois* directly controls the result here. Defendants have affirmatively conceded that they have no knowledge of any relationship between plaintiff and Papelera Alcoyana; and they make no allegation that Papelera Alcoyana possesses any right to distribute BAMBU paper in the United States. Hence, even if the paper defendants sold was indeed identical to plaintiff's product, defendants' unauthorized distribution of that product in the United States would nonetheless have infringed upon plaintiff's rights.[8]

8. Even those recent authorities that have narrowly construed the *Bourjois* opinion and denied relief against importation and distribution of "genuine" goods have done so only when there is an affiliation between the U.S. and foreign trademark owners, *see e.g., NEC Electronics v. Cal Circuit Abco*, 810 F.2d 1506, 1510 (9th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987); *Olympus Corp. v. U.S.,* 792 F.2d 315, 321 (2d Cir.1986), *petition*

*d. The Absence of Statutory Notice*

Noting that plaintiff failed to mark its paper with the statutory notice of trademark registration provided by Lanham Act § 29, 15 U.S.C. § 1111, defendants argue that both of plaintiff's Lanham Act claims must fall absent proof that defendants continued distribution of BAMBU paper after express notification of infringement—a triable issue of fact. Again as a matter of law, the claim is flawed.

Section 29 of the Lanham Act, 15 U.S.C. § 1111, provides:

> A registrant of a mark ... may give notice that his mark is registered [by displaying certain specified legends on his product] ...; and in any suit for infringement under this chapter by such a registrant failing to give such notice of registration no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration.

Under this provision, if notice of registration has not been attached to the mark, damages for infringement under 15 U.S.C. § 1114(a) (provided by 15 U.S.C. § 1117) are limited to those arising after the defendant received actual notification of the infringement. The holder of a mark is, however, under no legal obligation to give advance notice of its rights to an infringer before seeking damages or injunctive relief for infringement. *Le Sport Sac, Inc. v. K. Mart Corp.,* 617 F.Supp. 316, 317–18 (E.D. N.Y.1985). The only consequence of a holder failing to give such notice is that damages might start running later than if the notice had been given. Hence, even on plaintiff's infringement claim, the absence of statutory notice will not preclude summary judgment on the issue of liability for purposes of granting injunctive relief. *See, e.g., Howard Stores Corporation v. Ho-*

*for cert. filed,* 55 U.S.L.W. 3372 (U.S. Nov. 25, 1986) (No. 86–757), or when the domestic owner of the mark authorized the manufacturer to place the mark on foreign made goods, *see, e.g., El Greco Leather Products Co. v. Shoe World, Inc.,* 599 F.Supp. 1380 (E.D.N.Y.1984), *rev'd,* 806 F.2d 392 (2d Cir.1986), and *Monte Carlo Shirt, Inc. v. Daewoo Intern.,* 707 F.2d 1054, 1058 (9th Cir.1983).

*ward Clothing, Inc.*, 311 F.Supp. 704 (N.D. Ga.1970) (injunctive relief upheld although plaintiff not entitled to damages due to failure to display statutory notice or prove actual notice).

With respect to plaintiff's remaining causes of action—under § 43(a) of the Lanham Act, 15 U.S.C. § 1125, and under the common law doctrine of unfair competition—the absence of statutory notice has no relevance whatsoever. Because registration is not a prerequisite to either cause of action, liability may be found and damages are recoverable regardless of whether the legends provided in § 29 are affixed to the goods. *See Polo Fashions, Inc. v. J & W Enterprises*, 229 U.S.P.Q. 69, 71 [786 F.2d 1156 (table)] (4th Cir.1986) (upholding summary judgment for monetary relief under § 43(a) despite absence of notice under § 29); and *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 208 U.S.P.Q. 421, 427 (S.D.N.Y.1980) (since claim for unfair competition under New York State law is independent of registration, absence of statutory notice is no bar to recovery of damages and profits, citing, *Flexitized, Inc. v. National Flexitized Corporation*, 335 F.2d 774 (2d Cir.1964)).

In short, while defendants are correct that plaintiff's failure to mark its goods as provided by the statute bars recovery of damages on the infringement claim except on proof of actual notice, the omission has no bearing at all on plaintiff's damage recovery on its other two claims, nor does it affect plaintiff's entitlement to equitable relief on the infringement claim. Thus, it is no bar to the summary judgment relief plaintiff seeks on the issue of liability under each of its three causes of action.

### e. The Sufficiency of Plaintiff's Showing

Turning to the sufficiency of plaintiff's showing, apart from the matters advanced in support of their defenses and discussed earlier, defendants have proffered no evidence contradicting plaintiff's factual assertions on this motion. Hence, a brief examination of the adequacy of plaintiff's proof to support summary judgment as to liability on its claims against the corporate defendants should suffice to resolve the issue.

With respect to the two Lanham Act claims—trademark infringement under § 32(1) (15 U.S.C. § 1114(1)) and false designation of origin under § 43(a) (15 U.S.C. § 1125(a))—the principal issues are essentially the same. Plaintiff must establish a protectible legal interest in the mark and must demonstrate that defendants' use of it is likely to confuse consumers as to the source of the product. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir.1986). *See also Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, slip op. 95 (2d Cir.1987); *Centaur Communications, Limited v. A/S/M Communications, Inc.*, 830 F.2d 1217 (2d Cir.1987). Even though defendants were involved neither in the manufacture nor in the affixing of the mark to the infringing product, their sale of that product constitutes "sufficient 'use' [to render them] liable for the results of such infringement and [their] claimed lack of knowledge of [their] supplier's infringement, even if true, provides no defense." *El Greco Leather Products Company, Inc. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir.1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987), *citing, inter alia, De Acosta v. Brown*, 146 F.2d 408, 410–11 (2d Cir.1944), *cert. denied*, 325 U.S. 862, 65 S.Ct. 1198, 89 L.Ed. 1983 (1945). *See also Apollo Distributing Company v. Apollo Imports Inc.*, 341 F.Supp. 455, 458 (S.D.N.Y.1972) (need not show intent to deceive under § 43(a); "[i]t is sufficient that the public may be deceived.").

Finally, state law standards for establishing a claim for unfair competition are generally easier to meet than the requirements under the Lanham Act. *Mortellito v. Nina of California Inc.*, 335 F.Supp. 1288 (S.D. N.Y.1972). Hence, if plaintiff's showing suffices to establish the federal claims, summary judgment on the state claim would also be appropriate. *See J. McCarthy, Trademarks and Unfair Competition*, § 23:30 at 139 (under the "modern majority view ...", "unfair competition ...

should be determined primarily by the likelihood of confusion test, and an intent to injure or confuse is merely a subsidiary test relevant to whether confusion is likely.").

As to the existence of a protectible property interest in the BAMBU mark, plaintiff has proffered a certified copy of a registration showing it to be the registered owner of the mark. Under the Lanham Act, 15 U.S.C. § 1115(a), this is *prima facie* evidence of plaintiff's "exclusive right to use the ... mark" and creates a rebuttable presumption that the mark is valid. Because, as reviewed above, the various claims of invalidity defendants have advanced do not rebut that presumption in this lawsuit, they present no impediment to summary judgment.

As to the likelihood of consumer confusion, it is uncontested that the boxes of paper defendants sold bore counterfeits of the BAMBU mark and were virtually identical to plaintiff's packaging in all other material respects.[9] Indeed, defendants themselves attested in their affidavits and depositions that they were deceived by the high degree of similarity between the counterfeit and genuine packaging. The products, too, are indisputably similar; in fact, as discussed above, it is defendants' opinion that the cigarette paper they sold is "identical" to plaintiff's product. Finally, defendants have not challenged any of plaintiff's ample proof regarding the strength of the BAMBU mark—indicating that over an 80 year period, it has become widely known to the consuming public and that plaintiff has incurred substantial expenditures in popularizing it. Thus, upon the established facts, plaintiff is entitled to judgment against each corporate defendant on the issues of liability under each of its claims as a matter of law.

### 3. *The Cross–Motions for Summary Judgment As to the Individual Defendants*

Plaintiff has also moved for summary judgment on all issues of liability against three individual defendants—Bernard Gulack, the manager of Gulack Trading Co., William Brooks, the president of Nu Service, and Brian Gold, the sales manager of Sultana. Gulack and Brooks have, in turn, cross-moved for summary judgment and Bernard Gold, Sultana's president, has also so moved. Each of the moving defendants urges that plaintiff's showing is insufficient as a matter of law to establish his personal liability since, in the case of Gulack and Brooks, they assertedly acted merely as "agents" of their respective companies and since, in the case of Bernard Gold, there is no showing of his participation in any wrongful act.

While a corporate officer is not necessarily individually liable for torts committed on behalf of the corporation, personal liability for trademark infringement and unfair competition is established "if the officer is a 'moving, active conscious force behind [the defendant corporation's] infringement.'" *Polo Fashions, Inc. v. Branded Apparel Merch.*, 592 F.Supp. 648 (D.Mass.1984) (citations omitted). As the Third Circuit has explained:

> A corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort.... This principle applies where the conduct constitutes unfair competition.... The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior; it does not however relieve the individual of his responsibility....

*Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978) (citations omitted) (showing that officer "authorized and approved the acts of unfair competition which are the basis of [the] ... corporation's liability ... is sufficient participation in the wrongful acts to make [officer] individually liable."). Further, in determining whether the officer's acts render him individually

---

**9.** The only difference is that the genuine boxes bear the label "Imported by Bambu Sales, Inc.", followed by plaintiff's address.

liable, "[it] is immaterial whether ... [he] knows that his acts will result in an infringement." *Polo Fashions, Inc. v. Branded Apparel Merch.*, 592 F.Supp. at 652–53 (officer, director and 25% shareholder who was responsible for corporate defendant's sale of infringing product held individually liable as the "conscious, moving force behind the sales that infringed [plaintiff's] trademark and common law rights."). *See also Selchow & Righter Co. v. Goldex Corp.*, 612 F.Supp. 19 (S.D.Fla. 1985), and *Polo Fashions, Inc. v. BDB, Inc.*, 223 U.S.P.Q. 43 (D.S.C.1983).

■ Turning to the facts of this case, it is uncontested that defendant Bernard Gulack, the manager of defendant Gulack Trading (who attests that he "run[s] the company and make[s] the decisions"), purchased the counterfeit BAMBU paper from a "Spanish jobber ... named Eddie" and resold it to "various jobbers", including defendant Sultana. (Gulack Deposition, pp. 8–11, 25–34). It is similarly uncontested that the defendant William Brooks, the president and a director and shareholder of Nu Service, specifically instructed his buyer concerning the purchase and subsequent resale of the infringing merchandise, approved these transactions and personally examined the goods. (Brooks Deposition, pp. 10, 14–17, 27–29, 35–40; Belman Deposition, pp. 23, 54). Likewise, it is undisputed that defendant Brian Gold, the sales manager of Sultana, arranged for the purchase and resale of the counterfeit paper, personally received the merchandise, and was in fact the only individual at Sultana who was involved in the transactions. (Brian Gold Deposition, pp. 11, 25, 33, 36, 54, 112–113).

Because these established facts demonstrate that Gulack, Brooks and Brian Gold are the "moving, active conscious forces behind [their respective corporations'] infringement", *Polo Fashions, Inc. v. Branded Apparel Merch.*, 592 F.Supp. at 652, plaintiff is entitled to summary judgment against them on the issue of liability on each claim. With respect to Bernard Gold, however, the record contains no facts to support his liability. Indeed, the evidence suggests that he had no involvement at all in any wrongful act by Sultana. (Brian Gold Deposition, pp. 112–113). Accordingly, his motion for summary judgment dismissing the complaint as to him should be granted.

## B. Sultana's Disqualification Motion

■ Sultana contends that plaintiff's attorney, Milton Springut, Esq., should be disqualified from further representation of plaintiff in this proceeding because he is a "potential witness" for plaintiff on the question of whether Sultana received actual notice of BAMBU's trademark registration sometime prior to ceasing its infringing sales. Specifically, Sultana proffers the affidavit of Brian Gold attesting that, on June 4, 1986, he received a telephone call from Springut and that, in that conversation,

> Mr. Springut did not advise me that BAMBU was a registered trademark owned by plaintiff and did not provide specific factual information as to why Sultana was not free to purchase BAMBU paper from other sources.

Urging that plaintiff "must establish at trial actual notice of registration to secure damages on [either of] the Lanham Act counts", Sultana asks that Springut be disqualified from representing plaintiff or, alternatively, that plaintiff and its attorney be required to elect between Springut as attorney and Springut as witness. In response, plaintiff maintains that actual evidence of registration is of "no moment" at this juncture in the lawsuit since plaintiff may recover damages under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), absent such notice. Additionally, plaintiff purports to make the election defendant has proposed, representing that Milton Springut will not be called as a witness for plaintiff at any trial.

Disciplinary Rule 5–102(A) of the Code of Professional Responsibility provides that "[i]f, after undertaking employment in a contemplated or pending litigation, ... it is obvious that ... a lawyer ... ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial...." In determining whether a law-

yer "ought to be called as a witness," "the test is whether the attorney's testimony could be significantly useful to his client." *MacArthur v. Bank of New York*, 542 F.Supp. 1205, 1209 (S.D.N.Y.1981). " 'It is not objectionable for a lawyer who is a potential witness to be an advocate if … his testimony would be merely cumulative or if his testimony will relate only to an uncontested issue.' " *Id.* at 1208, *quoting* Ethical Consideration 5–9. Obviously, application of the rule "requires a careful evaluation of the relevant issues in the case and of other available testimony." *Id.* at 1208. Once a determination has been made that a lawyer "ought to be called as a witness," however, the rule has been interpreted to preclude the attorney and client from electing between testimony and representation; except in circumstances establishing a substantial hardship, the attorney must step down. As one court has explained it, the "stricture" of the rule is "mandatory." *Id.* at 1209. *See also J.P. Foley & Co. Inc. v. Vanderbilt*, 523 F.2d 1357, 1359 (2d Cir.1975). *But see S & S Hotel Ventures v. 777 S.H.–Corp.*, 69 N.Y. 2d 437, 515 N.Y.S.2d 735, 508 N.E.2d 647 (1987). Finally, the party seeking disqualification bears the burden of demonstrating that opposing counsel's continued participation would violate the rule. *MacArthur v. Bank of New York*, 524 F.Supp. at 1209.

The record presented on this motion does not warrant a finding that Milton Springut "ought to be called as a witness" at any future time in this proceeding. As plaintiff points out, the "issue" defendants advance as the subject of his "potential testimony" is of little significance to the plaintiff at this stage of the lawsuit. It is not necessary to determine whether the Sultana defendants received actual notice of plaintiff's registration in order to assess liability against them; in fact, it is recommended herein that plaintiff be granted summary judgment on the issue of liability on each of its three causes of action against Sultana and Brian Gold. Nor is it necessary to establish actual notice in order to assess

damages against them in connection with plaintiff's claim under § 43(a) of the Lanham Act and its state law cause of action for unfair competition. Rather, the notice issue arises solely in connection with plaintiff's request for damages under its Lanham Act infringement claim.

Even as to this limited issue, however, it is not clear on this record that Milton Springut "ought to be called as a witness." In urging that Springut is a "potential witness," the sole evidentiary support defendants muster is Brian Gold's assertion that, in their telephone conversation, Springut did *not* advise him of plaintiff's registration or otherwise communicate actual notice that the BAMBU mark was registered. Since there is nothing in the record to indicate that Milton Springut's version of this conversation in any way conflicts with that of Gold, Springut's testimony may be wholly immaterial on the issue. Similarly, the current record is inadequate to clarify what, if any, other evidence might be adduced on the question of actual notice. Hence, it is impossible to determine whether, even on this narrow issue, Springut's testimony would be cumulative. *Compare, J.P. Foley & Co., Inc. v. Vanderbilt*, 523 F.2d at 1359.

Because defendants have failed to establish a violation of Disciplinary Rule 5–102(A), I recommend that their disqualification motion be denied at this time. This is, however, without prejudice to their renewal of the motion at a subsequent time upon an appropriate showing.

## C. *Nu Service's Motion to Implead Rodesol*

Defendants Nu Service and Brooks have moved to implead Rodesol and its principal, Eduardo Rodriguez, their source for the counterfeit BAMBU paper. As indicated in their proposed amended complaints [10], they seek to assert causes of action for breach of contract, false designation of origin, breach of warranty and fraud. Defendants' justification for their

---

**10.** They seek to serve a third party complaint in *Bambu Sales, Inc. v. Gulack Trading Co., Inc., et al.*, CV 86–2045, and a fourth party complaint in

*Bambu Sales, Inc. v. Sultana Crackers, Inc. et al.*, CV 86–1928, in which they are third party defendants.

nine month delay in requesting this relief is that they were somehow misled by plaintiff's decision to commence a separate action against Rodesol and Rodriquez in lieu of adding them as parties defendant in the pending suits. Nu Service and Brooks also assert, without further explanation, that they will be "irreparably harmed" if the requested impleader is not granted.

Under Rule 14(a), Fed.R.Civ.P., a defendant who proposes to commence a third party action more than ten days after service and filing of an answer may do so only upon leave, and that determination is within the sound discretion of the court. *Rosario v. Amalgamated Ladies' Garment Cutters' Local 10*, 605 F.2d 1228, 1247 (2d Cir.1979), *cert. denied*, 446 U.S. 919 (1980). Further, where, as here, more than six months have elapsed since service of the moving party's answer, Rule 3(k) of the Civil Rules of this Court requires that leave be refused unless the movant makes a "showing of special circumstances and of the necessity for such relief in the interest of justice." The factors relevant to determining the existence of "special circumstances" include, *inter alia*, whether the movant was derelict in filing the claim and whether the trial of the principal action would be delayed or unduly complicated. *E.F. Hutton & Co. v. Jupiter Development Corp., Ltd.*, 91 F.R.D. 110, 113 (S.D. N.Y.1981).

The requisite showing has not been made here. Throughout the nine month period preceding the filing of the request, defendants have known the identity of their supplier. Moreover, any mistaken assumption they might have harbored that plaintiff intended to join Rodesol as a defendant in the lawsuit was no doubt dispelled when a separate action was commenced in this Court on July 1, 1986, some eight months before defendants sought leave to implead them. Defendants' delay of their request until responding to plaintiff's summary judgment motion is simply without reasonable justification.

More importantly, virtually all of the factual issues raised by the claims set forth in the proposed third and fourth party complaints are wholly unrelated to the issues posed in the primary suits. The impleader claims focus on the circumstances of the transactions between Rodesol and Nu Service—the nature of their contractual agreement and the existence of warranties or representations running to Nu Service. These matters have no bearing on the claims in plaintiff's lawsuit.

Most significantly, however, defendants' assertion of claims against Rodesol comes at a time when plaintiff's action against them is virtually concluded. It is herein recommended that all issues of liability be resolved by summary judgment in plaintiff's favor. If this recommendation is adopted, the only remaining issues concern damages and other final relief. Thus, this belated impleader request would, in effect, spawn a new and substantially unrelated lawsuit at the very moment the primary suit is reaching its conclusion. Since defendants can as easily pursue their claims against Rodesol in an independent action, their request to delay the primary suit is simply unwarranted.

### D. Nu Service's Pending Bankruptcy Proceedings

In papers submitted in opposition to plaintiff's summary judgment motion, William Brooks, Nu Service's president, states that Nu Service filed for Chapter 11 bankruptcy proceedings in December of 1986, and has been advised by the company's attorneys that all actions are therefore stayed pursuant to 11 U.S.C. § 362. In papers subsequently filed, Nu Service asked that the Court "continue the automatic stay pursuant to 11 U.S.C. § 362." The question thus posed is whether Nu Service's pending bankruptcy proceeding precludes plaintiff from securing the relief sought on this motion—that is, summary judgment as to liability on claims of trademark infringement and unfair competition.

The issue was addressed in *Steak & Brew Inc. v. Makris*, 177 U.S.P.Q. 412 (D.Conn.1973). There, plaintiff sought damages and injunctive relief for alleged trademark infringement and unfair competition by a corporate defendant that subse-

quently filed for bankruptcy. In examining whether the status of the pending action was affected by the bankruptcy petition, District Judge Claire distinguished between plaintiff's claim for equitable relief and its claim for damages. Concerning the claim for equitable relief, Judge Claire wrote:

> The general staying order of the referee in bankruptcy merely restrains the corporate defendant's creditors and agents "from taking any further steps or proceedings with respect to their respective indebtedness * * *." The plaintiff is not now a creditor of the corporate defendant, nor is the injunctive relief which it seeks predicated upon any indebtedness.

> The Bankruptcy Act was intended to protect and rehabilitate debtors. It should not be used as a shield behind which a debtor may sustain the misappropriation of a trade name to which he is not rightfully entitled. Nor will this Court permit it to be used as an instrument by which the damages to an innocent party may be increased unnecessarily. An immediate resolution of this dispute in the District Court in no way would conflict with either the referee's order or the purpose of the Bankruptcy Act.

*Id.* at 414. Judge Claire concluded that while plaintiff could not pursue its claim for damages without obtaining prior approval of the referee in bankruptcy, plaintiff was entitled to proceed upon its claim for equitable relief without such approval.

Here, as in *Steak & Brew, Inc.*, plaintiff has sought from Nu Service not only monetary recovery but also injunctive relief. Hence, following the persuasive reasoning of Judge Claire in *Steak & Brew, Inc.*, notwithstanding the bankruptcy court's order, plaintiff should be permitted to secure against Nu Service the limited relief sought on this motion—that is, summary judgment as to liability as a predicate to obtaining equitable relief. *See also Brennan v. T & T Trucking, Inc.*, 396 F.Supp. 615 (N.D. Okl.1975). *Cf. In Re Vylene Enterprises, Inc.*, 63 B.R. 900 (Bankr.C.D.Cal.1986).

## CONCLUSION

For the foregoing reasons, I recommend that an order be entered: (1) granting plaintiff's motion for summary judgment on the issue of liability on each claim as against corporate defendants Sultana, Nu Service and Gulack Trading and individual defendants Brian Gold, William Brooks and Bernard Gulack; (2) denying the cross-motions for summary judgment by individual defendants William Brooks and Bernard Gulack; (3) granting the motion of defendant Bernard Gold for summary judgment dismissing the complaint as to him; (4) denying the motion of defendants Sultana and Brian Gold for an order disqualifying Milton Springut, Esq. from representing plaintiff, without prejudice to leave to renew at a later time upon an appropriate showing; and (5) the motion of defendants Nu Service and William Brooks to implead Rodesol as a defendant in this action.

IT IS ORDERED that any objections to this Report and Recommendation be filed with the Honorable Joseph M. McLaughlin by December 24, 1987.